Dye, J.
This is an action for slander. The parties are well-known public figures. The plaintiff, Dr. E. Leonard Cheatum, is a nationally recognized authority on wild life and conservation. He has made it bis life career, serving in course of time as a teacher, writer and organizer, and has held public positions in that field in the conservation departments of the United States in several States of the Union and at the time in question was and for some time prior thereto had been a civil service employee in the New Tork State Conservation Department.
The defendant, Louis A. Wehle, a successful business man, has interested himself in wild life conservation. It has been for him an absorbing hobby, leading to the operation of a licensed game farm in connection with his extensive land holdings and the sponsorship of the widely advertised and popular “Louis A. Wehle Fishing Contest” and “Louis A. Wehle Conservation Contest ”, which carry with them substantial cash prizes for winners in various and assorted categories of fishing and hunting. In this connection, he also published and widely distributed complimentary copies of a booklet known as the “New York State Fishing Guide”, its authorship being credited to him as chairman of the board of the Genesee Brewing Company.
- On January 1, 1955 Governor Harriman appointed Mr. Wehle to his official family as the State Conservation Commissioner. He qualified and assumed the duties of that office. At that time, Dr. Cheatum was Chief of the Bureau of Game, Division of Fish and Game, in the State Conservation Department and, as such, was directly under the supervision of and responsible to the commissioner.
On or about May 31, 1956 Commissioner Wehle was the guest of honor at a dinner held at the Hotel Woodruff, Water-town, New York, which was attended by over 150 other persons, including a number of local sportsmen, civic and business leaders, members of the press and sports writers. Commissioner Wehle made a speech on the general subject: “What’s Wrong With The Conservation Department ”, in the course of which he allegedly said in part:
“ At Albany I found a secret society or fraternity among the employees. They stood around in groups in the corridors, whis *590 pering among themselves and looking at me out of the corners of their eyes. They were out to oppose anything I favored.
“ My Grenadier Island project for toughening pheasants under semi-wild conditions was torpedoed by that bunch.
‘ ‘ Twenty thousand birds were put on the island. All but five thousand died of botulism, a food poisoning. The reason they died was because the head of my game bureau, E. L. Cheatum, sent some five thousand birds there from the Delmar Game Farm. These birds were half dead from botulism when they were shipped. It was like taking kids with measles and putting them in a room with healthy kids. The rest contracted the disease as anyone might expect they would.
“ Cheatum was advised against sending these birds but he paid nqjieed. It was either deliberate sabotage or gross neglect on his part. It sunk the experiment. The State could well do without the services of such employees. What the Department needs is a good overhauling and that is what I plan to do right away—starting with Cheatum.”
The plaintiff alleges in his complaint that the quoted words were uttered willfully, falsely and maliciously, with the intent to injure him and his good name and reputation and to destroy his usefulness in the field of conservation and demands damages in the sum of $200,000.
By his answer, the defendant-appellant denied generally all of the material allegations of the complaint and interposed a series of defenses which fall generally in the category of ‘ ‘ fair comment”, “immunity from suit based on official privilege ” and by way of explanation and clarification of the language used as intending to mean something different from that attributed to it by the plaintiff.
Following joinder of issue, the plaintiff moved to strike the five separate defenses contained in the defendant’s answer on the ground of legal insufficiency. The defendant cross-moved to dismiss the complaint for failure to state a cause of action (Bules Civ. Prac., rule 109). The Special Term granted plaintiff’s motion in part and denied defendant’s cross motion in its entirety.
On cross appeals to the Appellate Division, Thitd Department, that court unanimously modified, on the law, the order of Special Term by striking out the first defense (designated *591 “ II ”) as a complete defense and permitted it to remain as a partial defense only and by strildng out the third affirmative defense (designated “IV”) and, as so modified, otherwise affirmed, Thereafter, the Appellate Division denied the defendant-appellant’s motion for reargnment and granted his motion for leave to appeal to this court on four certified questions. We are satisfied that the complaint states a cause of action.
The defendant-appellant, by his first defense (designated “II”), contends that the complained of statements which related in any way to the plaintiff were made without malice and in good faith; that the Grenadier Island project was a matter of grave public interest and concern to the taxpayers and inhabitants of the State and that it was not only his right but his duty as Commissioner of the Department of Conservation to report upon and discuss the policies, personnel, projects and general operation of the department so that the public might be kept fully informed and advised regarding its conduct and administration; in other words, that the utterance, although derogatory and defamatory in nature, in light of the background and circumstances of its making, was a fully justified expression of opinion and fair comment.
While the activities of a person holding public office may properly be criticized, whenever such criticism is of a derogatory or defamatory nature, the defense of fair comment is not available to one who makes false and untrue statements or unjustifiable inferences (Toomey v. Farley, 2 N Y 2d 71). Such protection, as we have said, ‘ ‘ extends to a fair and honest statement of actual facts relating to public acts and to reasonable and justifiable comment thereon and criticism thereof. It does not extend to attacks upon private character or to publishing defamatory things about an official even if the writer in good faith makes the publication believing his statements are true; neither does it permit a person to draw conclusions that are or that the jury may find are improper and unjustifiable ” (Bingham v. Gaynor, 203 N Y 27, 33).
Here it is not claimed that the opinion expressed— and it may be deemed an opinion because of its derogatory nature—is based on truth. In fact, a careful reading of the pleadings indicates, that the defendant-appellant denied he uttered the complained, of statement, and at the same time, he failed to allege *592 what in fact he did say or that what in fact he said was true or that his comments were based on facts believed to be true. His defense depends on a conclusory allegation based on his own estimate of the situation and may not serve as a substitute for facts (Julian v. American Business Consultants, 2 N Y 2d 1). The defendant charged the plaintiff with “ either deliberate sabotage or gross neglect ”, but nowhere does he plead the truth of the statement or that it is based on facts believed to be true. To that extent at least the privilege attending fair comment is insufficient to constitute a complete defense. However that may be, the first alleged complete defense (designated “ II ”) should not be stricken in its entirety, but should be allowed to stand so as to permit the defendant to prove ‘ ‘ mitigating circumstances, including the sources of his information and the grounds for his belief, notwithstanding that he has pleaded or attempted to prove a justification ” (Civ. Prac. Act, § 338; Crane v. New York World Tel. Corp., 308 N. Y. 470).
Under Federal decisions, it has long been held that an executive official is absolutely privileged to publish false and defamatory matter of another in the exercise of his executive function if the matter has some relation to the executive proceeding in which the official is acting (3 Restatement, Torts, § 591). The policy underlying such official privilege was succinctly enunciated by Haklah, J., viz.: “In exercising the function of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint.” (Spalding v. Vilas, 161 U. S. 483, 498.) This privilege protects a judicial officer in respect to acts done in the course of his judicial duties (Bradley v. Fisher, 13 Wall. [80 U. S.] 335) and has been applied to alleged libelous publications by a department head (Spalding v. Vilas, supra) and reiterated in Glass v. Ickes (117 F. 2d 273, cert. denied 311 U. S. 718), Joint Anti-Fascist Refugee Comm. v. Clark (177 F. 2d 79, revd. 342 U. S. 123). The doctrine of immunity based on official privilege is recognized in this State, being based upon “ con *593 sideration of public policy and to secure the unembarrassed and efficient administration of justice and public affairs” (Hemmens v. Nelson, 138 N. Y. 517, 523), and has been held to include “ official reports and communications by or to the executive head of a department of the government ” (Hyman v. Press Pub. Co., 199 App. Div. 609, 611). The desirability of such a policy is easily recognized as essential in the conduct of official business. For instance, section 164 of the Executive Law requires each department head to make an annual report to the Governor and to the Legislature. It is quite important that the executive so reporting should be free to make such report without fear of reprisal by civil suit for damages. Such an official report is based on facts and figures which become a public document on a matter of public concern upon which the Governor and the Legislature may rely in proposing budgets and adopting ameliorative legislation. The Commissioner of Conservation annually makes such a report. We are told that for the calendar year 1955, the commissioner made a full report on the Grenadier Island project and also on the outbreak of botulism at Delmar, with credit being given for the discovery of a new technique to impede the disease by innoculation. In The Conservationist, an official magazine published by the Conservation Department during the same period, no mention was made of either the Grenadier Island experiment or the botulism outbreak at Delmar. In none of these official documents was any mention made of the matter elaborated upon in the complained of utterance.
The rationale underlying the absolute privilege accorded official reports made in due course is not to be confused with comments made in the course of an after-dinner speech to a group of citizens who can do nothing about it in any event. To extend the absolute privilege to such activities would lead to all sorts of abuses and do great harm to individual victims without improving the service of government. This case falls within that general condemnation, since Commissioner Wehle had at hand a ready, effective, orderly and legal means of dealing with Dr. Cheatum, such, for instance, as the filing of charges and giving him an opportunity to be heard. The speech made by Commissioner Wehle, as the Appellate Division observed, was not greatly different from a speech of a member of the Legislature speaking to his constituents, explaining his votes or *594 berating some of Ms colleagues which enjoys no privilege outside the legislative halls. The succinct comment of the learned court below is worth quoting’: “No legal or moral duty was fulfilled by the defendant in advising private citizens that plaintiff was guilty of negligence or deliberate sabotage, because the audience could do nothing about it in any event, and hence there was no qualified privilege (Bingham v. Gaynor, 203 N. Y. 27),” Whether such privilege existed is a question of law under the circumstances (Ashcroft v. Hammond, 197 N. Y, 488; 3 Restatement, Torts, § 619).
The third defense (designated as “ IV ”) realleges the same allegation theretofore made (without repeating) for its first defense (designated as “II”) and second defense (designated as “ III ”) as a partial defense in mitigation of damages. Since, in the decision about to be made, the first defense (designated as “ II ”) is being allowed as a complete defense insofar as it is based on fair comment, there is no need to repeat such allegations; likewise, since the allegations in the second defense (designated as “III”) are deemed insufficient because the defense of absolute privilege is not available, they cannot stand as a partial defense for, in any event, the defendant has no immunity apart from his office. So viewed, a reallegation of the same matters based on the defense of absolute privilege has no place in the pleadings as a partial defense and was properly stricken in the court below for, quite obviously, its retention as a partial defense under such circumstances would be prejudicial to a fair trial.
Nothing more remains except a brief word as to the fourth defense (designated as “ V ”) which was an attempted clarification and explanation of the language used while the fifth defense (designated as “ YI ”) was a general denial that the reference to the secret society or fraternity among the employees had reference to Dr. Cheatum. The Appellate Division quite properly allowed the fourth defense to stand as relevant to the issue of punitive damage should that aspect be reached. In respect to the last partial defense, the Appellate Division succinctly disposed of it in the following comment: “- The plaintiff has the burden of proving that the statements were reasonably understood by listeners in the sense that would make them defamatory (Restatement, Torts, § 613). It is immaterial what the defend *595 ant intended: the test is what his audience reasonably understood him to mean (Restatement, Torts, § 580; Linehan v. Nelson, 197 N. Y. 482)
This partial defense was stricken, and properly so, since the defendant may prove under his general denial that he did not use the words which the complaint attributes to him.
The order appealed from should be affirmed, without costs, and each of the four certified questions answered in the affirmative.