Henry W. Lengyel, J.
This claim, which was duly filed and served, alleged that claimant sustained $500,000 in damages as the result of the State of New York negligently conducting an audit of the North Country Community College (hereinafter referred to as NCCC); and, thereafter, disseminating for publication to the news media an audit report which contained libelous statements relative to the cost and character of the computer service rendered by the claimant to NCCC. The audit report stated the following:
4. Use of Consultants
The College has engaged a certified public accountant to assist in the establishment and maintenance of the accounting records for the Capital Construction Fund and to provide such other financial services as may be needed. The College has also engaged a local computer service company to maintain payroll records and to process all payrolls. The cost of these services for the two years ending August 31, 1971, as shown on the College records, is as follows:
Service 1969-70 1970-71 Total
Financial Consultant $2,928.27 $ 4,507.88 $ 7,436.15
Payroll records 6,584.13 8,480.74 15,064.87
$9,512.40 $12,988.62 $22,501.02
The cost of these services, as shown on the above schedule, is incomplete since the financial consultant has not submitted a claim for services rendered after December 31, 1970. Nevertheless we believe that these costs are excessive for the services actually rendered and that the contracts should be terminated.
The services performed by both of these consultants could easily be performed by a single qualified employee at a lesser cost. For example, a significant portion of the work performed by the financial consultant is of a clerical nature. The balance could be handled easily by a capable Assistant Business Manager in a few hours. As for the computer service, this involves *333 the processing of payrolls for about 200 persons most of whom receive a uniform amount of compensation for each pay period. These payrolls and the supporting computation could easily be performed, on a part time basis by an additional employee who would be available for other work during the remainder of most pay periods.
Following the normal and routine practice of the Department of Audit and Control, the audit report was released to the news media on March 27, 1973. (See, also, Education Law, § 6304; State Finance Law, § 8; General Municipal Law, § 35.)
On March 28, 1973, the Adirondack Daily Enterprise, a newspaper servicing Saranac Lake, Lake Placid, and Tupper Lake, printed a front page article, relative to the audit report, which stated that
"Auditors found the college engaged a certified public accountant to assist in establishing and maintaining accounting records and engaged in [sic] local computer service company to maintain payroll records and process all payrolls. Cost of the services for two years ending Aug. 31, 1971, was $22,501.02, which, the auditors maintained 'are excessive for the services actually rendered,’ and they recommended that 'the contracts should be terminated.’
" 'The services performed by both of these consultants could easily be performed by a single qualified employe at a lesser cost,’ the auditors stated.
"This was an apparent reference to local certified public accountant William Sweeney, and Ward Telecommunication Systems of Ray Brook.”
The principal stockholders and officers of the claimant were Bela and Edwina Ward. Both Mr. and Mrs. Ward were educated and trained in computer science. They are well qualified and expert in their chosen field. I was impressed by their forthright honesty as witnesses at this trial.
In October or November of 1969, Mr. and Mrs. Ward decided to move to Saranac Lake, where Mrs. Ward had been born and reared. After investigating the potential in the area for a computer service, they decided to establish such a service and the claimant (hereinafter referred to as WTCS) was incorporated in December, 1969. It was the only local computer service in this area of northern New York. In January, 1970, WTCS was engaged by the business manager of NCCC, Mr. Doolittle, to prepare the college’s payroll on a bi-weekly basis and to provide other data processing service relative to the college’s capital budget and to the registrar’s office. Bill *334 ings were made on a monthly basis. Separate bills were presented for payroll work, capital budget work, and registrar office work. The college’s fiscal year was September 1 through August 31. Ernest Wood, the present business manager of NCCC, reviewed all of claimant’s bills for the period covered by the audit. He prepared a recapitulation of the billings and allocated the various bills to their separate categories. For the period January 1, 1970 through August 31, 1971, he allocated $4,763.99 to payroll, $2,734.20 to special reports or supporting payroll services, $5,032 to consulting services, $485 to capital budget, and $1,897.50 to registrar. In his opinion, the $7,498.19 allocated to payroll and supporting payroll services was not an excessive charge.
After the audit report, WTCS’s association with NCCC was terminated by Mr. Wood under instruction from his superiors. The payroll work is now being performed by one employee who devotes 50% to two thirds of her time to this assignment. This employee’s annual salary plus benefits is approximately $9,100. Thus the cost to the college for this work is from $4,550 to $6,000 a year. The college also purchased an $11,000 bookkeeping machine to assist this employee in performing her payroll duties.
The State’s audit commenced in the spring of 1971 and was completed in the spring of 1972. Three auditors were involved in the audit: Mr. Neltson McClellan, the Supervising Auditor; Mr. Regan, Auditor in Charge; and, Mr. Gormley, Assistant State Accounts Auditor.
Mr. Gormley prepared the basic audit. He was not aware of the fact that, upon completion of the audit, the Supervising Auditor McClellan had lumped all of WTCS’s billings under payroll charges. He was never asked to draw off from his worksheets the specific amount of payroll and related payroll charges and he did not know why Mr. McClellan had placed everything under payroll charges. He had discussed the computer service with the other auditors and the word "excessive” came into the conversation. He did not consider that the charges made for the services rendered were excessive. He stated that the word excessive was "used in the context that the services provided were more than the college needed for their payroll * * * [T]his computer service was not necessarily needed for this preparation of this payroll, and the various systems which we went through that we said were payroll items.”
*335 Mr. Regan gave his worksheets to Mr. McClellan when his work was completed and he was released by his superiors from this particular audit. He did not know why Gormley’s and his worksheets resulted in a final report which lumped all expenses under the category of payroll services. He stated that this might have been done in a rough draft report when invoices for consulting services did not specify the work involved in the consulting service and thereby force the college to provide a breakdown of the exact service rendered. He talked briefly with Mr. Ward who, after learning that WTCS’s charges were being questioned, sought to explain in detail what consulting services had been rendered. He said that "I explained to him that it was not a question of his services. That we felt the work could be done at the college. It was not a question of excessive cost.”
However, the final audit report resulted in the bald statement that "these costs are excessive for the services actually rendered”.
Mr. Ward wrote to State Comptroller Arthur Levitt on May 3, 1973 and forwarded a copy of the newspaper article in the Adirondack Daily Enterprise. He pointed out the errors in the audit report and requested that the report be corrected. Not having received a reply to the letter, Mr. Ward, on May 30, 1973, sent a telegram to Mr. Levitt requesting that corrective action be taken. On June 8, 1973, Deputy Comptroller Martin Ives wrote to Mr. Ward in response to the May 3, 1973 letter as follows:
"We acknowledge that the report did not fully describe the scope of the payroll and non-payroll services for which your company received payments of $15,064.87 over a two-year period. However, we still believe that the payroll operation could have been accomplished with college personnel at a lesser cost to the college. In making this judgment in our audit report, we did not intend to imply that your charges were excessive but rather that the college payroll operation is not large enough to justify the use of a computer.
"As you know, the college has implemented our recommendation that the payroll be done by college personnel. We estimate that the annual cost to the college for this operation is about $2,500.00, which is considerably less than was charged by your company.
"We sincerely regret any inconvenience that may have been caused you.” *336 Mr. Ward responded to the above by letter of June 16 and again requested that the errors in the original report be corrected. He did not receive any reply to his letter. The notice of intention to file a claim was filed with the Clerk of the Court of Claims on June 25, 1973 and was served upon the Attorney-General on June 26, 1973.
Deputy Comptroller Ives advised the court that after Mr. Ward’s letter of May 3 was drawn to his attention, he sent Mr. McClellan, the gentleman who was responsible for the audit report originally, back to NCCC to recheck the figures relative to WTCS. After examining Mr. McClellan’s final reports, the letter of June 8 was drafted and mailed. The court questions the wisdom of sending the same auditor back to check his figures and results. In my experience, there might be an understandable human tendency to write a report justifying the original conclusions. Certainly, the Department of Audit and Control would not permit a village clerk, who was being audited, to write a portion of his own audit. Should not the standards of the department, when checking the work product of its own personnel, be as explicit and stringent as those which prevail when auditing the books of other municipal and State employees? Particularly this should have been so for, in Mr. Ives’ opinion, Mr. McClellan did "Not completely * * * correctly perform his duties as they would relate to recording of Telecommunication Services for North Country Community College”.
Mr. McClellan’s judgment as to the internal cost of the payroll work at $2,500 did not square with the testimony of business manager Wood. Mr. McClellan assigned about 29.5% of one employee’s workload to payroll work. Mr. Wood testified that payroll work occupied 50% to 66% of one employee’s time. Mr. McClellan assigned 25% as the employee’s fringe benefits. Mr. Wood testified that it was about 30%. Mr. McClellan pointed out that the college had the use of a Burroughs machine at no charge. Certainly, a sophisticated "Principal State Auditor” would realize that such a beneficial situation would not continue to exist. Mr. Wood testified that an $11,000 check writing machine had to be purchased. The check writing machine was ordered on or before November 13, 1972. Did not Mr. McClellan ascertain that fact in May-June, 1973? And, no one seemed concerned about the fact that NCCC had to make physical changes in its business office space to efficiently perform the payroll services. Yet, at a *337 meeting of October 9, 1972, Mr. Wood advised the college’s board of trustees as follows: "In commenting on the Business Office, Mr. Wood said that the most critical problem at this time was the lack of physical space. He discussed the possibility of his staff handling the payrolls instead of having this work done by an outside firm as it would represent a more economical operation once the necessary equipment had been purchased. By enclosing the back porch adjoining the Business Office, Mr. Wood said the extra space which would be acquired would mean it would be possible to move some of the personnel and equipment, process the payrolls within the office, and, in general, provide a more efficient operation.” Certainly, all of the above raises substantial questions about the accuracy of Mr. McClellan’s $2,500 figure which Mr. Ives relied upon. Mr. McClellan was still employed by the State at the date of trial and, in fact, sat in the courtroom throughout the three days of trial. Unfortunately, he was not called as a witness so that the court could be advised as to the basis for his judgment; or, the reason for the incorrect libelous language as to "excessive charges” utilized in the audit report and reiterated in the newspaper article.
Dr. George A. Hodson, President of NCCC, testified that he had initially informally discussed the rough draft audit report with Mr. Regan and finally with Mr. McClellan and others at an "exit conference” held immediately before the auditors left the college. He stated that the gist of what he told the auditors was that the information contained in the report about the Wards was unfair to them and to the college "regarding payroll versus the total cost of computer services.” He stated that he asked the auditors to change the charges in the report as they related to WTCS but that no response was made by the auditors nor was any change made. According to Dr. Hodson, Mr. McClellan appeared very nervous and excited at the exit conference. He said McClellan "talked, in a nervous, very nervous rapid and sort of incoherent statements. His physical approach to the thing was very shifting, physically shifting position, generally throughout the whole thing * * * just a very nervous approach”. Of course, as Mr. McClellan was not called as a witness, the court was not able to evaluate his stability or capabilities.
Dr. Hodson advised the court that WTCS was "doing our payroll, for one thing. They were providing us with consultant services on a variety of subjects dealing with such matters as *338 our setting up the accounts for Capital Budgets, working with our Registrar, in helping to set up registration procedures, grade reports, records, this type of thing.” He obviously thought that the claimant had performed valuable and effective service for NCCC. He did not officially protest to the State University or the Department of Audit and Control the audit report statements about the local computer service. He advised that "I gave it up as a bad job. I had given it up. We discussed it with various people involved, to the point where we decided the best thing to do at this stage would be, okay, we will do it your way and go ahead and accept your version of it, as the simplest way out.” Thus, Dr. Hodson accepted a position in the ranks of those who say "You can’t fight City Hall.”
Mr. John H. Mulholland, Essex County Treasurer, C. P. A., businessman and a trustee of NCCC was subpoened by claimant as a witness. Mr. Mulholland did not initially respond to the subpoena but, after a telephonic invitation given him at the court’s suggestion, he deigned to appear. Mr. Mulholland actively participated in portions of the audit as a trustee of NCCC. In his opinion, the then business manager, Mr. Doolittle, was not capable and he thought the services provided by the computer company could be done internally at a monetary saving. He discussed his position with the auditors. At the trial, he said he had no position on the accuracy of the WTCS charges or whether its charges were or were not excessive. His only thought, he said, was that the service was a luxury that a college the size of NCCC could not afford and that the payroll work could be done less expensively internally. Mr. Mulholland was related both by blood and marriage to Mr. McClellan. Unfortunately, as Mr. McClellan was not called as a witness, this court has no way to determine whether the careless use of language in the audit report was the result of the careful audit evaluation we all are led to believe Comptroller Levitt’s forces provide; or, was it familially influenced by a relative who thought the business manager incompetent.
After an evaluation of all the testimony, it becomes crystal clear that absolutely no one thought that WTCS’s charges for computer services were "excessive for the services actually rendered”; a position in which, after a thorough and careful evaluation of the trial record and the evidentiary exhibits, this court completely concurs. Why then was this language used? As Mr. McClellan was not called as a witness, I was not *339 favored with an explanation from the State auditor who drafted the report. Certainly, "a Principal State Auditor, a Supervising Auditor” knows how to write the English language and knows the import and impact of words used in an audit report of the State Department of Audit and Control. This court would dislike to believe, because of the exemplary, lengthy, and uninterrupted service of the Comptroller to the people of this State, that certain of those of lesser status in this fine department are becoming arrogant in the power that they wield. However, on the facts presented, I must come to the conclusion that the misrepresentation in this report either reflected arrogance to the point of wanton recklessness; or incompetence to the point of negligent recklessness; or a state of health which prevented an accurate utilization of language; or an attempt, without regard to the end result, to accomplish a result desired by a relative; or a malicious effort by Mr. McClellan to deliberately injure WTCS and others. As stated in People v Valerius (31 NY2d 51, 55): " 'Under such circumstances,’ as Presiding Justice Herlihy, dissenting below, observed (36 AD2d, at p. 673), 'where the People had control of the witness and his availability was not questioned, the trial court should have assumed that Cotter’s testimony would be unfavorable to the People and thus corroborative of the defendant’s claim of abuse.’ (See, also, Noce v Kaufman, 2 NY2d 347, 353; People v Moore, 17 AD2d 57, 59; Laffin v Ryan, 4 AD2d 21, 25-26; 2 Wigmore [3d ed., 1940], p. 163.)” (See, also, Matter of Randel, 158 NY 216, 219; Milio v Railway Motor Trucking, 257 App Div 640, 642; Reehil v Fraas, 129 App Div 563, 566.)
Upon all the facts before me and under an inference that Mr. McClellan’s testimony would have been adverse to the defendant, I find that the State of New York through its representatives wantonly and negligently libeled the claimant by the statements contained in its audit report and reproduced at an earlier point in this decision.
Having made the above determination, the court must now determine whether the State may be cast in damages for its libel, or whether such libel is cloaked and protected by an absolute or qualified privilege.
As the State of New York does not, as yet, have to serve an answer to a filed claim (Rules of Court of Claims, rule 1200.14, 22 NYCRR 1200.14; Hill v State of New York, 29 AD2d 824; Vern Norton, Inc. v State of New York, 27 AD2d 13; Terry *340 Contr. v State of New York, 27 AD2d 499), the court was not favored with any pleadings which indicated whether the State’s lawyer was relying on absolute or qualified privilege. As the State’s lawyer did not refer to the question of privilege during the trial, the court was left in the dark on that point.
Despite the court’s statement at the end of the trial that "I would * * * appreciate receiving memorandum of law and any highlighting of facts that either counsel wishes to draw to the Court’s attention”, the Assistant Attorney-General did not favor the court with a memorandum of law. In fact, the court was rather cavalierly advised that the State attorney did not intend so to do by a correct copy of a letter written to claimant’s counsel. Thus, to this point in time, I do not know the State’s position on the question of privilege, or even whether the State considers such question of import to my decision.
In an address to the American College of Trial Lawyers, which was reprinted in the New York Law Journal (March 27, 1975, p 1, col 3), Chief Judge Irving R. Kaufman of the Second United States Court of Appeals, said "The fundamental premise upon which our adversary system is based may be stated rather succinctly. It is, as Lord Eldon said, that 'truth is best discovered by powerful statements on both sides of the question.’ ” The Chief Judge then proceeded to state (p 5, col 2): "In short, there is a natural inclination to have judges do lawyers’ work * * * But judges can no longer compensate for lawyers who do not present their clients’ cases as well as wit and effort allow. To the extent that the judiciary is required to act without counsel’s help, it will be at the expense of deliberating, discussing, and deciding. That is to say, it will be at the expense of practicing our craft of judging.” Several of my colleagues have already commented on the lack of co-operation received from certain lawyers. Most reluctantly, I now join their ranks. Fortunately, however, claimant’s counsel presented a thorough and comprehensive statement of facts and memorandum of law, which was of substantial assistance to this court.
Two of the leading cases in this State on the subject of privilege are Cheatum v Wehle (5 NY2d 585) and Sheridan v Crisona (14 NY2d 108). In the latter, Judge Scileppi wrote (p 112) that "The initial question is whether, under the circumstances here, defendant is to be accorded an absolute privilege. The solution in that regard is suggested in Cheatum v. Wehle *341 (5 NY2d 585), wherein the court stated (pp. 592-593): 'Under Federal decisions, it has long been held that an executive official is absolutely privileged to publish false and defamatory matter of another in the exercise of his executive function if the matter has some relation to the executive proceeding in which the official is acting (3 Restatement, Torts, § 591). * * * The doctrine of immunity based on official privilege is recognized in this State, being based upon "consideration of public policy and to secure the unembarrassed and efficient administration of justice and public affairs” (Hemmens v. Nelson, 138 N. Y. 517, 523), and has been held to include "official reports and communications by or to the executive head of a department of the government” (Hyman v. Press Pub. Co., 199 App. Div. 609, 611). The desirability of such a policy is easily recognized as essential in the conduct of official business.’ ” The Court of Appeals then, by a divided vote, extended the doctrine of absolute privilege to the President of the Borough of Queens. It is of interest to note that Judge Dye, who wrote the majority opinion in the Cheatum case, dissented in the Sheridan case on the predicate that only a qualified privilege should have been accorded the defendant. Judge Van Voorhis concurred with Judge Dye on the point of qualified privilege.
A close examination of these decisions convinces this court that it is not required to extend the doctrine of absolute privilege to routine audit reports prepared by auditors of the State Department of Audit and Control. The only case in point on the question of privilege as it relates to a report of the State Department of Audit and Control is that of Peeples v State of New York (179 Misc 272) wherein Judge Barrett, writing for a two-Judge court, stated (p 276):
"The rule of absolute privilege was designed particularly and peculiarly for the protection of those public officers acting in a judicial, legislative, or executive capacity and was not intended as a shield for the unguarded, reckless, or malicious statements of all who perform governmental functions. (See Restatement, Law of Torts, Vol. III, Introductory Note, p. 223 et seq.; also, § 585 et seq.)
"The examiners’ report rather carried with it the protection of qualified or conditional privilege.”
It has been held that the defense of qualified privilege must be pleaded and proved. (Teichner v Bellan, 7 AD2d 247, 252; Duffy v Kipers, 26 AD2d 127, 129.) However, as previously stated, the State does not, as yet, have to serve an answer and *342 plead an affirmative defense. The question has arisen in the court’s mind, as to whether the State waived the defense of qualified privilege, by not raising it as a defense at any point during the trial. However, I have come to the conclusion when, on claimant’s direct case, it was established that the libel emanated from an official audit report, the State’s right to the protection of a qualified privilege was established. Claimant, therefore, bore the burden of proving the abuse of that privilege. It is my opinion, and I so find, that claimant proved wanton and reckless negligence in the preparation of the audit report, as it related to WTCS, which was tantamount to malice and which successfully overcame the defense of qualified privilege. (See Shapiro v Health Ins. Plan, 7 NY2d 56, 61; Kremer Constr. Co. v Garfinkel, 31 AD2d 766.)
I do not believe that the State should be held liable for an error of judgment, such as existed in the case at bar when Mr. Ives, based on Mr. McClellan’s incorrect estimate, stated the payroll work could have been accomplished internally for $2,500 a year; and I have not considered that error in arriving at my final conclusion. However, I do find that, when conduct equatable with malice underlies a libel in a routine audit report, the State must be required to respond in damages. (See Trails West v Wolff, 32 NY2d 207, 219.) To hold otherwise could eventually destroy the credibility and efficacy of audit reports. As written by Judge Dye in his dissenting opinion in Sheridan v Crisona (14 NY2d 108, 116-117, supra): "Officials of whatever rank and grade need have no fear of incurring liability for acts based on truth. Indeed, our public servants are more likely to be responsive to the wishes of the public if they are required to account for their malicious falsehoods. As one writer has perceptively observed, 'When an official has taken advantage of his position to appeal to public opinion on a disputed matter, it appears that the public need for accurate information will be furthered by permitting a judicial determination of the presence of malice and the truth of the statement.’ (Comment, The Supreme Court, 1958 Term, 73 Harv. L. Rev. 84, 240 [1959] * * *.)” (Cf. Duffy v Kipers, 26 AD2d 127, supra.)
It was the State’s trial position that, as the audit report did not actually name the claimant as the local computer service company which charged excessively for its services, the State could not be held to have libeled the claimant. Such is not the law of New York as I understand it to be. "It is not necessary *343 that the person defamed should be named in a defamatory publication if, by intrinsic reference, the allusion is apparent or if the publication contains matters of description or reference to facts and circumstances from which others may understand that the person complaining is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him could and did understand that he was the person referred to. (34 NY Jur, Libel and Slander, § 55.)” (See Van Ingen v Mail & Express Pub. Co., 156 NY 376, 386; Cole Fisher Rogow, Inc. v Carl Ally, Inc., 29 AD2d 423, 426; Michaels v Gannett Co., 10 AD2d 417, 420, 421.) WTCS was the only local computer service in the area and the newspaper, which published the libel, was quick to connect it to the claimant. The defendant cannot write an article defaming another and shield itself by not revealing the name of the person libeled. When its descriptive material is sufficient to permit the public to connect the libel to the party defamed, liability will ensue. (See Campo v Paar, 18 AD2d 364, 368.)
The statement that claimant charged excessively for its services constituted a libel per se. (See Sanderson v Caldwell, 45 NY 398, 402; Shubert v Variety, 128 Misc 428, 432.) Judge Fuld wrote in Nichols v Item Publishers (309 NY 596, 600-601) that: "The general rule, we stated in Mencher v. Chesley (297 N. Y. 94, 100), is that 'A writing is defamatory — that is, actionable without allegation or proof of special damage — if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him.’ And to that listing of the defamatory should be added a writing which tends to disparage a person in the way of his office, profession or trade”. (See, also, Drug Research Corp. v Curtis Pub. Co., 7 NY2d 435, 440.)
It was claimant’s officers unrefuted testimony that prior to the publication of this libel their business, i.e., WTCS, had been growing and that negotiations were underway with several potential new clients. After the publication, the acquisition of new clients became nonexistent and that condition continued for many months. Specific financial damage was demonstrated through the testimony of Joseph Brooks, Comptroller of Saranac Lake General Hospital. His testimony and the WTCS bills in evidence proved that the hospital had not paid the claimant for $10,000 worth of services performed in 1973, by taking advantage of the weak position of WTCS in *344 the community after the news report that claimant had overcharged for its services. Claimant was a relatively new endeavor in a small community. Its officers did not, with reason, believe it could afford to contest Mr. Brooks’ position that he would not authorize payment for services for which the hospital might be being overcharged. Claimant was faced with the choice of continuing to provide services and accept inadequate compensation or lose the hospital contract entirely. In a rural area, where word of mouth spreads like a brush fire, the loss of another corporate client with an imputation of overcharging could have sounded claimant’s death knell. Thus, claimant did not contest what to this court seemed totally unfair conduct on the part of the hospital officials.
I find that the Claimant has been damaged in the sum of $25,000 and such amount is hereby awarded to claimant.
I reserved decision on objections by the State to testimony relative to the Wards’ reaction to this libel. I now overrule such objections.
I reserved decision on the State’s motions to dismiss. I now deny said motions.
Claimant’s counsel has asked that the court award punitive damages. Although I consider that punitive damages may lie against the State, I do not find that claimant has developed a case supportive of such damages.