Harold GLANTZ, Plaintiff,

v.

COOK UNITED, INC., Martin M. Lewis, Bernard H. Barnett, Harry M. Broder, Calvin B. Dalton, Stanley M. Fisher, Dan Freedman, James T. Griffin, Joseph H. Jackier, Jerry V. Jarrett, George Jeffers, Samuel S. Kaufman, Robert N. Lehmann, Warren K. Ornstein, and Louis T. Roth, Defendants.

No. 79 C 1497.

United States District Court,
E. D. New York.

Dec. 27, 1979.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for plaintiff.

Donovan, Leisure, Newton & Irvine, New York City, for defendants.

Memorandum of Decision and Order

MISHLER, Chief Judge.

In this diversity action plaintiff, Harold Glantz, seeks compensatory and punitive damages from the defendants, Cook United, Inc. ("Cook") and the members of Cook's Board of Directors, for injuries sustained by reason of the defendants' publication of allegedly libelous statements. Both the corporate and individual defendants moved to dismiss the complaint on the ground that it fails to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), and the individual defendants moved on the additional ground that the court lacks jurisdiction over their person, Fed.R.Civ.P. 12(b)(1). The affidavits of the parties' attorneys offered in support of and in opposition to the motion presented matters outside the complaint. Accordingly, pursuant to Fed.R.Civ.P. 12(b), the court advised the lawyers that defendants' 12(b)(6) motion would be treated as one for summary judgment under Fed.R.Civ.P. 56 and gave the parties the opportunity to submit further affidavits. For the reasons which follow, the court grants summary judgment in favor of the defendants and dismisses the complaint.

*BACKGROUND*

Sometime in the Spring of 1979, several stockholders of Cook formed a committee known as the "Stockholders Protective Committee of Cook United, Inc." (the "Committee"). The Committee's purpose was to secure the election of its own slate of candidates to seats on Cook's Board of Directors by obtaining the proxies of the company's shareholders. Pursuant to this plan, the Committee nominated Robert Brindle and Philip Levy as its candidates for the contested seats.

On April 26, 1979, Cook brought suit against the Committee and its members in the United States District Court for the Southern District of New York, alleging that the Committee had violated several of the federal securities laws and rules, particularly those pertaining to proxy solicitations. On May 21, 1979, in an extensive written opinion, Judge Cannella granted summary judgment in favor of the Committee. *Cook United, Inc. v. "Stockholders' Protective Committee of Cook United, Inc.",* No. 79 Civ. 2189 (S.D.N.Y. May 21, 1979).

Thereafter, on May 24, 1979, Martin M. Lewis, as chairman of Cook's Board of Directors, mailed a letter to approximately 6,000 to 10,000 shareholders. This letter, referred to by the parties as the "Cook letter," serves as the hub of the instant action. It advised the shareholders of the outcome of the Southern District action, and further stated:

We have previously written to you concerning Committee nominees Robert Brindle and Philip Levy. The litigation has revealed the existence of a contact between them, of which we were previously unaware: one *Harold Glantz.* Here is some additional information concerning these men which we believe may be of interest to you.

1. Robert Brindle

The Court [Judge Cannella] found that Mr. Brindle was introduced to Sanford Fishbein of the Committee by Glantz. In pretrial proceedings in the litigation, it had been developed that this Mr. Glantz was a business associate of Brindle's in connection with a proposal Brindle had made to the Company last year to acquire a number of the Company's properties and form them into "mini amusement parks" to be run by Mr. Glantz. Mr. Glantz's involvement did not surface at that time.

Although we had urged that Mr. Glantz's activities made him a "participant" on behalf of the Committee, the Court was not persuaded. However, the Court suggested that we could, if we believed it desirable to do so, present to the shareholders the information we uncovered with respect to Mr. Glantz, so that you could be the judge of its significance.

.... In the course of our inquiries we also uncovered a letter concerning Mr. Glantz written on March 12, 1975 by New York City Commissioner of Investigations

Nicholas Scoppetta. The full text of Commissioner Scoppetta's letter is enclosed for your consideration. However, we want to call attention to the Commissioner's conclusion, which states:

In conclusion, the Department's investigation has revealed that in addition to derogatory information gleaned from other sources, according to the State Investigation Commission, Harold Glantz has apparently been an associate of high–level organized crime figures and has apparently served as an agent for them in their encroachment on legitimate business interests.

The above paragraph was set off from the rest of Lewis' letter and printed in bold type. The letter continued:

As you can see from the attached, Commissioner Scoppetta suggested that these findings should be considered by the City of New York in determining whether it would be in the best interests of the City to continue business discussions with Mr. Glantz. The City apparently determined not to do so, and Glantz sued Scoppetta in New York State Supreme Court claiming that the letter was "false and defamatory." However, on July 28, 1977, Justice Alexander of that Court dismissed Glantz's complaint, finding that Glantz had offered "not even a scintilla of evidence" to support his charge of malice against Commissioner Scoppetta.

Lewis' letter then stated, in italicized form:

*This is the same Mr. Glantz whom Committee nominee Brindle planned to bring in to the deal he proposed last year–a deal Brindle testified he still thinks is a "good idea" for the Company and the same Mr. Glantz who introduced Mr. Brindle to the Committee.*[1]

The complaint in this action, which was filed on June 12, 1979, alleges that the Cook letter was written by Lewis, "individually and on behalf of the Board of Directors," "[i]n an attempt to discredit Brindle and

Levy in the eyes of the shareholders and to prevent their election to the Board of Directors," and "contained false, malicious, libelous and defamatory statements concerning plaintiff." (Par. 27). Specifically, in paragraphs 29 and 30, the complaint recites the gravaman of the plaintiff's claims:[2]

29. By such publication, defendant Lewis individually and on behalf of the Board of Directors, stated and intended to state that plaintiff was and is a criminal, that plaintiff was and is a "front" for high–level organized crime figures in encroaching upon legitimate business; and that plaintiff is associated with organized crime figures.

30. Defendant Lewis individually and on behalf of the Board of Directors of defendant Cook, knowing, willfully and intentionally failed to advise the shareholders of defendant Cook: (1) none of the statements contained in the Scoppetta letter has been substantiated; (2) there is no evidence that plaintiff is now or ever has been a criminal, associated with high–level organized crime figures, or a "front" for high–level organized crime figures; and (3) the complaint filed by plaintiff against Scoppetta was not dismissed on its merits.

The complaint further makes the alternative allegations that the defendants published the letter "in a negligent manner" (Par. 32); "in a grossly irresponsible manner;" "with malice in fact ... in that the defendant LEWIS intended to harm plaintiff by such publications" (Par. 33); and "with actual malice in that same was published with knowledge of its falsity or with reckless disregard as to its truth" (Par. 34).

The affidavit submitted by defendants' counsel states that during the course of discovery in the Southern District action

Cook learned that ... Glantz ... was a close business associate of one of the

1. A copy of the May 24, 1979 mailing, together with a copy of the March 26, 1976 letter of Commissioner Scoppetta which was enclosed with it, is appended hereto.

2. The complaint contains four claims–all based on the allegations contained in paragraphs 29 and 30.

Committee members, Philip Levy. Indeed, we learned that Mr. Glantz shared office space with Mr. Brindle, that it was he who had introduced Mr. Brindle into the Committee at Mr. Levy's suggestion, and that Glantz had attended meetings in this connection with one Sanford Fishbein, the principal organizer of the Committee. Moreover, Mr. Brindle testified that Mr. Glantz had an interest in a real estate venture Brindle had first proposed to Cook in 1978, and which Brindle was still interested in pursuing. While Glantz himself was not a Cook shareholder, his wife was a stockholder of record of Cook common stock.

The affidavit further states that "in view of . . . Glantz's role in the proxy contest," Cook undertook "a review : . . of the public record files concerning Mr. Glantz." In the course of this review, it discovered the libel action brought by Glantz against Scoppetta which was referred to in· the Cook letter. *Glantz v. Scoppetta*, No. 7400/77 (Sup.Ct.N. Y.Co. Mar. 11, 1977). Appended to the complaint in that action was the basis of that suit, *viz.,* a March 12, 1976 letter by Commissioner Scoppetta to Alfred Eisenpreis, Administrator of the Economic Development Administration. It is the quotation from that letter in, and that letter's enclosure with, Cook's May 24, 1979 letter to its stockholders, which plaintiff complains of here.

The defendants' attorney's affidavit then recites that judgment dismissing the Supreme Court action was entered on December 6, 1977, pursuant to a written opinion by Justice Alexander issued on July 28, 1977. The opinion, appended as an exhibit to the affidavit, stated that since Scoppetta wrote the letter "while acting within the scope of his official capacity as Commissioner of Investigation," "he [was] accorded absolute immunity under the clear doctrine of *Cheatum v. Wehle,* 5 N.Y.2d 585, 186 N.Y. S.2d 606, 159 N.E.2d 166 . . . ." Justice Alexander went on to state that even if

Scoppetta were not entitled to absolute immunity, summary judgment in his favor would nonetheless be appropriate, since "plaintiff has contented himself with bare denials. Not even a scintilla of evidence is offered in support of the chanrge of mailce [sic]; . . . ." Finally, as is pertinent here, the defendants' attorney's affidavit states that in the Southern District action, while Judge Cannella found that Glantz was not a "participant" in the Cook proxy contest, he "suggested that Cook could, if it desired to do so, inform its shareholders of the information it had discovered concerning those whom were claimed to have been 'participants' including Mr. Glantz. Because of Mr. Glantz' activities in support of the proxy contest and because both of Glantz' friends on the Committee, Messrs. Brindle and Levy, became Committee nominees to the Board of Directors of Cook, Cook decided to do so." The May 24, 1979 letter followed.

It is against this factual background that defendants' motion to dismiss was presented. Three grounds in support thereof are raised: (1) the publication of the May 24, 1979 letter was absolutely privileged under § 74 of the New York Civil Rights Law in that it constituted "a fair and true report of [a] judicial proceeding . . . ," *viz., Glantz v. Scoppetta* ; (2) the publication was privileged as a communication made in the course of business by a corporation to its shareholders; and (3) the plaintiff can not complain of the republication of statements which he placed on the public record in the first instance.

In response, plaintiff raises several factual contentions and legal arguments. First, he contends that defendants should not be entitled to the protection of § 74 of the Civil Rights Act for the consequences of their "reporting" the state libel action since, under § 3016(a) of the New York Civil Practice Law and Rules, the plaintiff was required to plead the defamatory words, *i. e.,* the Scoppetta letter, *in haec verba.*[3]

---

3. C.P.L.R. § 3016(a) provides:
   In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally.

Thus to allow the privilege to be invoked in cases such as these would open "plaintiffs in defamation actions [to] the terrible risk that the defamatory language appearing in their pleadings may, with impunity, be published by anyone whether or not connected with the libel action under the cloak of § 74. ... [T]his result was clearly not intended by the Legislative ...." Plaintiff's Memorandum of Law, p. 8.

Next, plaintiff argues that even if § 74 can be applied generally to reports of libel proceedings, on the facts of the instant case, the Cook letter did not constitute a "fair and true report" of the Supreme Court action. According to the plaintiff, defendant improperly failed to advise their shareholders that Justice Alexander "never addressed ... the issue of the truth of the allegations contained in the Scoppetta letter ...." Sorkin Affidavit, Para. 10. Indeed, he claims that the Cook letter never revealed the fact that Justice Alexander dismissed the action on the ground that Scoppetta was absolutely privileged to publish the alleged libelous statements, Plaintiff's Memorandum at 12, and that it "was not dismissed on the merits." Complaint, Para. 48. Moreover, by reporting Justice Alexander's finding that plaintiff had failed to substantiate his claim of malice, defendants mislead the Cook shareholders by neglecting to advise them that "in the context of a libel claim, malice is a term of art ...." Id.

Finally, plaintiff argues that Cook cannot claim that the allegedly libelous statements were privileged as communications made to shareholders in the course of business, since plaintiff was not involved with the subject matter of the communication, i. e., the proxy contest between Cook and the Committee. In support of this claim, plaintiff's attorney's affidavit asserts that at the time

the Southern District action was filed, Brindle was in the process of constructing a recreational facility which would then be leased to a company of which Glantz was a principle. This transaction had nothing to do with Cook. The affidavit further asserts that in 1978, Brindle proposed to Cook that he purchase some properties which Cook was seeking to dispose of. Brindle intended to develop these as recreation facilities and then lease them to Glantz. "Once Cook disposed of these facilities, Cook would have nothing to do with the arrangement between Brindle and Glantz." Sorkin Affidavit, Para. 14, 15.[4]

The affidavit further states that Levy was a close friend of Glantz. He asked Glantz to join the Committee and suggested that Glantz speak to another member of the Committee, one Sanford Fishbein. Glantz, after speaking to Fishbein, declined to join the Committee, but suggested to Fishbein that Brindle might be interested. Thereafter, Brindle joined the Committee, presumably at Fishbein's invitation.

Finally, plaintiff notes that he was neither named as a party nor deposed in the Southern District action, and that Judge Cannella rejected Cook's contention that Glantz was an undisclosed participant in the Committee's proxy fight.[5]

## DISCUSSION[6]

Section 74 of the Civil Rights Law provides in pertinent part; that:

[a] civil action cannot be maintained against any person, firm or corporation for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

---

"This requirement is strictly enforced and the exact words must be set forth." *Gardner v. Alexander Rent–A–Car, Inc.*, 28 A.D.2d 667, 280 N.Y.S.2d 595 (1st Dep't 1967).

4. Plaintiff does not deny defendants' claim that at the time he made the proposal, Brindle failed to reveal that Glantz was a close business associate with whom he shared office space. Nor does he contest the assertion that Cook first

learned of the association in the course of the Southern District action.

5. Plaintiff further asserts that he did not own any Cook stock. His wife, however, owned 15 or 18 shares.

6. The parties agree that New York law applies.

The "obvious reason" for providing a privilege to publish reports of judicial proceedings "is the public interest in having proceedings of courts of justice public, not secret, for the greater security this give[s] the proper administration of justice." *Lee v. Brooklyn Union Pub. Co.*, 209 N.Y. 245, 248, 103 N.E. 155, 156 (1913), *quoted in Williams v. Williams*, 23 N.Y.2d 592, 597, 298 N.Y.S.2d 473, 477, 246 N.E.2d 333, 336 (1969). This public interest has been conceived of as being so great that while statutory predecessors to § 74 limited the protection afforded to members of the media who published their reports without malice, the privilege is now granted to "any person" whether or not he acts with malice. *See generally, Williams v. Williams, supra*, 23 N.Y.2d at 597–98, 298 N.Y.S.2d at 477–79, 246 N.E.2d at 336–38, E. Seelman, The Law of Libel and Slander in the State of New York, 261–181 (1961). And, encompassed within the privilege is the right to publish a "fair and true" report which contains information that is "false" as a matter of fact. *See, e. g., Schneph v. New York Times Co.*, 32 Misc.2d 237, 223 N.Y.S.2d 90, 94 (Sup.Ct. Bronx Co. 1961) ("[T]he purpose of the statute is to protect absolutely from liability for libel one who, without concerning himself in the slighest with the truth of defamatory statements made of or concerning another in the course of an official proceeding, publishes a fair report of that proceeding including the libelous matter.").

■ Against this well–established expression of public policy we cannot accept plaintiff's position that § 74 should not be applied to reports of libel actions. It may appear somewhat unfortunate that plaintiffs in such cases, by reason of § 3016 of the C.P.L.R., must plead the allegedly libelous statements and thus open themselves to the risk of their republication. However, libel actions, as most others, are public. As such, they may be fairly reported.

This case is thus clearly unlike *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 313 N.Y.S.2d 104, 261 N.E.2d 257 (1970), where the New York Court of Appeals held that § 74 did not protect the reporting of matrimonial proceedings. There, the Court noted that New York law prohibited the copying or inspection of the records of matrimonial proceedings by anyone other than the parties or their counsel. Thus, "[s]ince . . . matrimonial actions were and are not proceedings which the public had the right to hear or see, it follows . . . that the privilege generally accorded to reports of judicial proceedings is unavailable to reports of matrimonial actions." *Id.*, at 14–15, 313 N.Y.S.2d at 107, 261 N.E.2d at 253 (citations omitted).

Nor does this case fall within the other limited exception to § 74 carved out by the New York Court of Appeals in *Williams v. Williams, supra*. There, a party instituted an action for the sole purpose of republishing the allegedly libelous statements he set forth in the complaint. The Court of Appeals held that the individual could not avail himself of § 74 to avoid the consequences of his "perversion of judicial proceedings." 23 N.Y.2d at 599, 298 N.Y.S.2d at 479, 246 N.E.2d at 338. To hold otherwise would be contrary to the legislative purpose and would result in the court's "sanctioning an ingenious means of defamation." *Id.*, at 598–99, 298 N.Y.S.2d at 478–79, 246 N.E.2d at 337.

■ To conclude, plaintiff has not presented us with one compelling reason to bar application of the literal words of § 74. In the absence of such a reason we are compelled to treat defendants' "report" of the *Glantz v. Scoppetta* libel action as we would treat the report of any other public judicial proceeding. Thus, if it was "fair and true" it was privileged. We find that it was, indeed, "fair and true."

First, we note that the complaint in the instant action focuses its charge on the portion of the Scoppetta letter which was reprinted in the Cook letter. The Scoppetta letter, however, was quoted directly from the complaint in the state court action. As it has long been held that statements in pleadings fall within the protection of § 74, *see, e. g., Campbell v. New York Evening Post*, 245 N.Y. 320, 157 N.E. 153 (1920), the actual reprinting of the *Scoppetta* letter was privileged.

Next, we reject the contention that the defendants did not accurately "report" the state proceedings. It is true that they failed to note that Justice Alexander dismissed the action on the ground of Scoppetta's privilege. And, it is true that they failed to define the term "malice." However, we doubt that such additional statements would be of critical importance to the lay reader. As a matter of fact, Glantz' action was—as defendants reported—dismissed. And—as reported—Justice Alexander did find that Glantz had not introduced a "scintilla of evidence" in support of his charge of malice. To require, as a matter of law, that reporters of judicial proceedings recite the precise legal reasons for court action and provide their readers with definitions of terms whose meanings are heatedly argued over by those trained in the law would effectively eviscerate the protection of § 74. It is for this reason that it has been held that § 74 provides protection where the report sets forth no more than a "substantially fair account of what took place." *Edmiston v. Time, Inc.*, 257 F.Supp. 22, 25 (S.D.N.Y.1966). *See The Holy Spirit Association for the Unification of World Christanity v. The New York Times Co.*, 49 N.Y.2d 63, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (N.Y.1979) ("When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision."). We find, as a matter of law, that the Cook letter met this standard. *See* Seelman, *supra*, at Par. 228 ("Where the question of fair report arises solely from the publication of the contents of legal documents ... it is for the court to decide.").

■ Finally, we note that even if the Cook letter was not protected by § 74, defendants would still be entitled to summary judgment since this case falls under the rule that "[a] communication made by one person to another upon a subject in which both have an interest is protected by a qualified privilege." *Stillman v. Ford*, 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 897, 238 N.E.2d 304, 306 (1968).

This well-established qualified privilege has been applied in numerous circumstances, including cases such as this one where parties having an interest in a corporation or other institution have made arguably libelous statements in the course of communicating with other interested parties on the subject of the institution's management. *See, e. g., Stillman v. Ford, supra;* [7] *Ashcroft v. Hammond*, 197 N.Y. 488, 90 N.E. 1117 (1910). Notwithstanding plaintiff's contention that he had nothing to do with the subject matter of the communication, *i. e.*, the proxy contest, we believe that the privilege applies.

In the broadest sense the subject matter of the Cook letter involved the proposed composition of the company's Board of Directors. More specifically, it dealt with Brindle and Levy's qualifications. These subjects were clearly matters of common interest to Cook and its shareholders, and Cook thus had "the right to endeavor to convert [its shareholders] to [its] view, and for that purpose to state such facts relative to the subject as [it] believed to be true." *Ashcroft v. Hammond, supra*, 197 N.Y. at 494, 90 N.E. at 1119. In this context, plaintiff's admitted business association with Brindle and his reputed connection with organized crime were matters which Cook properly brought to the shareholders' attention. The fact that Glantz, as a matter of fact, may not have been involved in the proxy contest is irrelevant. Clearly, the information concerning Glantz was not so

7. The language of the Court in *Stillman* is particularly apposite:

   The parties herein were engaged in a dispute about the policy of an institution in which they were all deeply interested. In defending their respective positions, each faction accused the other of misrepresenting its views in order to win support. Whether or not, in the final analysis, any of these accusations were true or false is hardly relevant. As long as the statements were motivated not by ill will or personal spite but by a sincerely held desire to protect the institution, they are not actionable.
   22 N.Y.2d at 53, 290 N.Y.S.2d at 897, 238 N.E.2d at 306.

totally unrelated to Brindle's qualifications that it can be said to fall without the "subject matter" of the communication.

■ Once the qualified privilege is established, plaintiff has the burden of proving "[by] evidentiary facts that the defamatory statements were motivated by either 'actual malice,' . . . 'actual ill–will' . . . or 'personal spite' . . . or culpable recklessness or negligence." *Stillman v. Ford, supra*, 22 N.Y.2d at 48, 290 N.Y.S.2d at 897, 238 N.E.2d at 306 (citations omitted). Plaintiff has merely accused defendants of actual malice, recklessness, and an intention to harm the plaintiff. These conclusory allegations fall short of satisfying the required burden.

Defendants' motion for summary judgment is granted, and it is

SO ORDERED.[8]

The Clerk of the Court is directed to enter judgment in favor of defendants and against the plaintiff dismissing the complaint.

May 24, 1979

Dear Fellow Shareholder:

We recently advised you of the lawsuit we commenced against the group which has styled itself the "Stockholders Protective Committee of Cook United, Inc.", alleging violations by them of a number of the provisions of the Federal Securities laws. After a two day hearing on May 15 and 16, 1979, the Court found that the defendants had violated one of the SEC's proxy rules but declined to grant the injunction which the Company had sought, and dismissed the complaint. In so deciding, the Judge made clear his view that the Company's share-

holders, not the Court, should decide the composition of the Company's Board of Directors after being furnished with all of the relevant facts.

Although we and our counsel believe the Court was wrong in a number of respects, for the present, rather than take an immediate appeal, we think it is more important to bring to your attention information we developed in the course of the litigation, so that you can decide whether the Committee's nominees are worthy of your vote.

We have previously written to you concerning Committee nominees Robert Brindle and Philip Levy. The litigation has revealed the existence of a contact between them, of which we were previously unaware: one *Harold Glantz*. Here is some additional information concerning these men which we believe may be of interest to you.

1. Robert Brindle

The Court found that Mr. Brindle was introduced to Sanford Fishbein of the Committee by Glantz. In pre–trial proceedings in the litigation, it had been developed that this Mr. Glantz was a business associate of Brindle's in connection with a proposal Brindle had made to the Company last year to acquire a number of the Company's properties and turn them into "mini amusement parks" to be run by Mr. Glantz. Mr. Glantz's involvement did not surface at that time.

Although we had urged that Mr. Glantz's activities made him a "participant" on behalf of the Committee, the Court was not persuaded. However, the Court suggested that we could, if we believed it desirable to do so, present to the shareholders the information we uncovered with respect to Mr. Glantz, so that you could be the judge of its significance.

We discovered that in 1970, a company with which Mr. Glantz was associated–Ba-

---

8. Because of our disposition of the motion, we do not address the individual defendants' contention that the court lacks jurisdiction over their persons.

gels, U.S.A., Inc.–was the subject of an SEC proceeding suspending the effectiveness of a securities offering because not all of that company's principals were disclosed. In the course of our inquiries we also uncovered a letter concerning Mr. Glantz written on March 12, 1975 by New York City Commissioner of Investigation Nicholas Scoppetta. The full text of Commissioner Scoppetta's letter is enclosed for your consideration. However, we want to call attention to the Commissioner's conclusion, which states:

> In conclusion, the Department's investigation has revealed that in addition to derogatory information gleaned from other sources, according to the State Investigation Commission, [Harold Glantz has apparently been an associate of high–level organized crime figures, and has apparently served as an agent for them in their encroachment on legitimate business interests.]

As you can see from the attached, Commissioner Scoppetta suggested that these findings should be considered by the City of New York in determining whether it would be in the best interests of the City to continue business discussions with Mr. Glantz. The City apparently determined not to do so, and Glantz sued Scoppetta in the New York State Supreme Court claiming that the letter was "false and defamatory." However, on July 28, 1977, Justice Alexander of that Court dismissed Glantz's complaint, finding that Glantz had offered "not even a scintilla of evidence" to support his charge of malice against Commissioner Scoppetta.

*This is the same Mr. Glantz whom Committee nominee Brindle planned to bring in to the deal he proposed last year–a deal Brindle testified he still thinks is a "good idea" for the Company and the same Mr. Glantz who introduced Mr. Brindle to the Committee.*

We do not believe that either Mr. Brindle or his associate Mr. Glantz is a *"good idea"* for the Company. But we are sending this information on to you so that you can be the judge.

## 2. Philip Levy

Committee nominee Philip Levy, who the litigation disclosed is a long–time friend of Harold Glantz and who put Fishbein in touch with Glantz, has filed a document with the SEC in which he states his agreement to contribute $25,000 to support the Committee's proxy contest; this amounts to almost half of the funds pledged by Committee members and nominees, according to their SEC filings as of May 18, 1979. Yet, the same document discloses Mr. Levy's ownership of only 500 shares of the Company's Common Stock, an investment of approximately $3,500. Mr. Levy testified at a pre–trial hearing that he first bought his Cook Common Stock on March 23, 1979 when he was asked to serve on the Committee's slate of nominees to the Board. At the same time, Mr. Levy's SEC filings affirmatively disclaim "any arrangement or understanding" with any person with respect to future employment by Cook or its affiliates, notwithstanding his commitment to spend $25,000 on this proxy contest.

*We leave it to you to decide why Mr. Levy is willing to spend $25,000 on this proxy contest when his total investment in the Company is only $3,500.* But we would point out that just one year ago, in June 1978, Mr. Levy became operating head of a company called Metrocare, Inc.–after a two–year struggle for control of that company–the day after his son was elected to the Board.

If you share our thoughts, please sign and return the GOLD proxy. Even if you have voted before, and even if you have voted for the Committee's nominees, it is still not too late to change your mind. It is the latest dated proxy that counts.

On Behalf of the
Board of Directors,
Martin M. Lewis
*Chairman of the Board*

130 JOHN STREET, NEW YORK, N. Y. 10038
Telephone:    825–5913

[SEAL]
NICHOLAS SCOPPETTA
*Commissioner*                    March 12, 1976

Stanley N. Lupkin
Edward R. Hammock      CONFIDENTIAL
*Deputy Commissioners*      BY HAND

Honorable Alfred Eisenpreis

Administrator

Economic Development Administration

225 Broadway

New York, New York 10007

Re:  *Harold Glantz*

Dear Mr. Eisenpreis:

This Department has conducted an investigation into the background of the above–referenced individual, pursuant to your written request dated December 26, 1975.

In the course of its investigation, this Department contacted a number of law enforcement agencies in New York City, including the New York City Police Department, the New York State Commission of Investigation, the Southern and Eastern District U.S. Attorney's Offices, and the Southern and Eastern District Organized Crime Task Forces.  Investigations conducted by some of these agencies developed evidence which leads them to conclude that close ties have existed between Mr. Glantz and high–level organized crime figures.

In March, 1970, the New York State Commission of Investigation published its findings of an in–depth investigation of organized crime in a report entitled, "Racketeer Infiltration into Legitimate Business." A portion of this investigation dealt with the influence of organized crime on the bagel industry.  The S.I.C. report revealed that a Brooklyn store, Bagel Boys, opened in 1964 and a subsequently incorporated company, Bagels, U.S.A., Inc., were both operated by organized crime figures.  Harold Glantz was identified as "a partner in Bagel Boys" and "played a major role in the union negotiations, representing his bagel shop." (Page 53)  Other persons, identified by Federal, State and City law enforcement agencies, as major organized crime figures including Thomas Eboli, a/k/a Tommy Ryan, and John Dioguardi, a/k/a Johnny Dio were also involved in these enterprises.  Furthermore, on February 27, 1967, Harold Glantz testified under oath before the S.I.C. in their investigation.  Mr. Glantz refused to answer questions concerning his involvement in the bagel industry and his relationship with major organized crime figures, (e g. Thomas Eboli, John Dioguardi, Carlo Gambino) based upon his fifth amendment privilege against self–incrimination.  This Department is presently attempting to obtain permission from the S.I.C. to forward to you a copy of Glantz's testimony should you feel that it is necessary.  A copy of pages 52–64 of the State Investigation Commission report relative to Bagel Boys is enclosed for your perusal.

It should be noted that the Securities and Exchange Commission uncovered significant irregularities in the funding and operation of the corporation, and in August 1970, issued an order (See attached S.E. Release 33–5079) permanently suspending Bagels, U.S.A., Inc. from offering stock to the public as a result of its failure to disclose the identity of all persons who owned stock and failure to disclose all the outstanding loans made to it.  (copy enclosed).

In conclusion, the Department's investigation has revealed that in addition to derogatory information gleaned from other sources according to the State Investigation Commission, Harold Glantz has apparently been an associate of high–level organized crime figures, and has apparently served as an agent for them in their encroachment on legitimate business interests.

I hope that these findings assist you in determining whether you feel it would be in the best interests of the City to continue the preliminary discussions with Mr. Glantz.

If we can be of any further assistance to you, do not hesitate to contact me.

Very truly yours,

/s/ Nicholas Scoppetta

Nicholas Scoppetta

Commissioner

Enclosures (2)