Fuld, J.
In this defamation action, a former President of Queens College and the New York City Board of Higher Education have interposed a defense of absolute privilege in connection with an allegedly libelous statement they made denying charges that anti-Catholic bias had influenced promotions on the Queens College faculty.
The charges were originally voiced in 1958 and the Board of Higher Education promptly ordered an investigation by a committee, headed by Porter Chandler, Esq., on which the Catholic, Protestant and Jewish faiths were equally represented. The *397 committee issued a report sometime later, noting that “It is only natural when a man’s promotion is passed over or delayed that he should try to explain it to himself, and perhaps to others, by seeking some extraneous reason. This natural process was reflected by some of the witnesses who appeared before us In conclusion, the committee found
* ‘ no satisfactory evidence that Catholics as such have been discriminated against in respect of promotions. * * * [nor any] pattern of religious discrimination at Queens College, and no instance in which there is any basis for preferring charges of religious discrimination against any person now at Queens College
While the committee was conducting hearings and drawing up its report, the State Commission Against Discrimination (SCAD) — now the State Commission on Human Rights — instituted an independent investigation of the matter. The Board of Higher Education challenged the commission’s power to act in the field of public education and brought an article 78 proceeding to have the issue of jurisdiction decided by the courts. In connection with this litigation — which was ultimately resolved in SCAD’s favor (see Matter of Board of Higher Educ. v. Carter, 14 N Y 2d 138) — a Commissioner of SCAD filed an affidavit in October, 1960 which, he declared, was based partially on interviews with “ present or former faculty members of Queens College ”. The affidavit, charging that the appointment and promotional processes at Queens College were tainted with religious bias and prejudice, received exceedingly widespread coverage in the press.
Confronted with this adverse publicity, the President of the college, the defendant Stoke, decided that it was necessary to defend the school against the attack and to issue a public explanation of the situation. He discussed the matter with the Chairman of the Board of Higher Education, who authorized the preparation of such a statement and approved the text before it was released to the newspapers. After reciting that it was made in response to the SCAD affidavit, the statement went on to declare:
“ The agitation about anti-Catholic discrimination at Queens College has been fostered, if not originated, *398 almost entirely by a few members of tbe College’s own staff. These persons, nnable to convince eolleagnes of tbeir qualifications for advancement, have over a period of years, deliberately charged religious discrimination to explain their lack of academic success and to obtain promotion. It is time the College made this clear.
‘ ‘ Virtually everyone in the faculty and administration of Queens College knows this background and tolerates the questionable professional conduct of these colleagues as a part of the price educational institutions pay for the benefits of a system of permanent tenure.
“Unfortunately, people outside the College do not understand this. The College has not wished to dignify the circulation of anonymous letters, false statistics and trivial campus gossip as worthy of public discussion. * * * The time has come when the silence of the College has ceased to be a virtue.
# * #
“ Queens College has a thoroughly democratic system of recruitment, appointment and promotion. It seeks its staff from the widest and most diverse sources. The College makes no inquiry and has no records of any kind as to the religious affiliation of its staff.
# # #
“ Queens College has not engaged in the past, nor will it engage in the future, in anti-Catholic discrimination.”
It is conceded that the statement was intended and understood to refer to the plaintiffs, two associate professors at Queens College. We note in passing that they have previously, and unsuccessfully, sued the defendant board claiming that they were passed over for promotion in 1961 solely because of anti-Catholic discrimination. (See Matter of Lombardo v. Board of Higher Educ., 13 N Y 2d 1097.) In the present action for libel, the defendants interposed the defense of absolute privilege and moved for summary judgment. The court at Special Term denied the motion but, on appeal, the Appellate Division reversed, granted the motion and dismissed the complaint.
Whether or not the president of a municipal college may, under'appropriate circumstances, raise the defense of absolute *399 privilege — as opposed to qualified privilege (compare Sheridan v. Crisona, 14 N Y 2d 108, and Sanford v. Howard, 185 Okla. 660, with Hemmens v. Nelson, 138 N. Y. 517) — is a question we do not now decide in view of the record before us. In their complaint, the plaintiffs have actually alleged that the defamatory statement was issued “ with the knowledge and consent ” of the defendant hoard and published after the board “ ratified and approved” the text. Accordingly, we need concern ourselves only with the .scope of the board’s privilege which, under the circumstances, may be invoked by President Stoke who was allegedly acting at the board’s direction and on its behalf. Our decision in Sheridan v. Crisona (14 N Y 2d 108, supra) is authority for holding here that the Board of Higher Education was absolutely privileged to issue this press release.
In the Sheridan case (14 N Y 2d 108, supra), the plaintiff alleged that he had been defamed in a report which had originally been submitted by the Borough President of Queens to the Mayor of the City of New York and which was ultimately released for publication in the newspapers. We held that “ a Borough President acting within the scope of his official powers must be accorded the protection of absolute privilege ’ ’, found that he was, indeed, ‘ ‘ acting within the scope of his official duties when he * * * made [the] report ” and concluded that, since ‘ ‘ the report * * * concerned a matter of public concern ”, its subsequent release to the press was proper (14 N Y 2d, at pp. 112-113).
In reaching this result, we cited with approval, among other decisions, Barr v. Matteo (360 U. S. 564), a case in which the facts were not' too unlike the one before us. In 1953, a scandal developed in the Federal Office of Rent Stabilization concerning employees who were permitted to take their accumulated annual leave in cash and were then rehiréd on a temporary basis. The affair became a cause célebre in the newspapers and the Acting Director of the agency was prompted to suspend two subordinate officials who, he implied in a press release, were responsible for the misdeeds. The two officials sued for libel but the Supreme Court held that the statement was absolutely privileged. It was emphasized that the Director was the head of “an important agency of government ’ ’, that the “ integrity ’ ’ of the internal operations of the agency had been ‘ ‘ directly and *400 severely challenged”, that “wide publicity” had been given to the charges, and that the issuance of a press release was “ standard agency practice ” (360 U. S., at p. 574).
In the case before us, the Board of Higher Education is undoubtedly an “ important agency ” of municipal government; its ‘ ‘ integrity ” had, indeed, been ‘ ‘ directly and severely challenged ” by charges of anti-Catholic bias at Queens College; and those accusations had been given “ wide publicity Under these circumstances, “a publicly expressed statement of the position of the [board] * * * was am appropriate exercise of the discretion which [the board] * * * must possess if the public service is to function effectively.” (360 U. S., at pp. 574-575; see Sheridan v. Crisona, 14 N Y 2d 108, supra; Duffy v. Kipers, 26 A D 2d 127; Smith v. Helbraun, 21 A D 2d 830; Manceri v. City of New York, 12 A D 2d 895; Spalding v. Vilas, 161 U. S. 483, 498; Sauber v. Gliedman, 283 F. 2d 941, cert. den. 366 U. S. 906; Gregoire v. Biddle, 177 F. 2d 579, cert. den. 339 U. S. 949; Glass v. Ickes, 117 F. 2d 273; Mellon v. Brewer, 18 F. 2d 168, cert. den. 275 U. S. 530.)
We have previously recognized that making the official statements of some government executives absolutely privileged is “ ‘ essential in the conduct of official business ’ ”. (Sheridan v. Crisona, 14 N Y 2d 108, 112, supra.) In our view, the members of the defendant Board of Higher Education are such executives and they should be free to report to the public on appropriate occasions “without fear of reprisal by civil suit for damages ” (14 N Y 2d, at p. 112; see Smith v. Helbraun, 21 A D 2d 830, supra; contra Ranous v. Hughes, 30 Wis. 2d 452). Particularly at the present time, when so much attention has been directed toward eliminating bias and prejudice in the administration of our school systems, it is essential that the public be candidly and promptly informed of the merits underlying such charges. This cannot be done if those who bear the responsibility for operating the public schools — here the Board of Higher Education — have reason to be apprehensive that their motives for speaking out may be misunderstood and give rise to damages in a subsequent suit for defamation. The public’s need to know must, therefore, take precedence over the individual’s right to defend his reputation in court. Judge Leaehed *401 Hand put it most persuasively in Gregoire v. Biddle when he declared (177 F. 2d 579, 581, supra):
“ [A]n official, who is in fact guilty of using his powers to vent his spleen upon others * * * should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would he monstrous to deny recovery. * * * [But] it is impossible to know whether the claim is well founded until the case has been tried, and * * * to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all hut the most resolute, or 'the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. * * * In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.”
Absolute privilege does not, of course, mean that a public official can always defame with impunity. He may still be sued if the subject of the communication is unrelated to any matters within his competence (see James v. Powell, 14 N Y 2d 881) or if the form of the communication — e.g., a public statement— is totally unwarranted. (See Cheatum v. Wehle, 5 N Y 2d 585; Jacobs v. Herlands, 51 Misc 2d 907, affd. 259 App. Div. 823.) In such cases, absolute privilege would “ do great harm to individual victims without improving the service of government ”. (Cheatum v. Wehle, 5 N Y 2d 585, 593, supra.)
However, the case before us is clearly of a different stripe. Considering the widespread newspaper coverage given to the charges of bias, the propriety, indeed the necessity, of a public statement by the board may hardly be doubted. Nor may it properly be said that the board went beyond the sound exercise of its discretion in choosing to comment on the origin as well *402 as the truth of the accusations. That being so, it follows, as we wrote in the Sheridan case (14 N Y 2d 108, 112-113, supra), that the board was “ acting within the scope of [its] official powers [and] must be accorded the protection of absolute privilege ”.
The order of the Appellate Division should be affirmed, with costs.