42 N.Y.2d 272 (1977)
Henry I. Stukuls, Appellant,
v.
State of New York, Respondent. (Claim No. 59376.)
Court of Appeals of the State of New York.
Argued May 5, 1977.
Decided July 7, 1977.
Thomas P. Gilhooley and Theodore Fenstermacher for appellant.
Louis J. Lefkowitz, Attorney-General (Alan W. Rubenstein and Ruth Kessler Toch of counsel), for respondent.
Opinion by Judge FUCHSBERG in which Judge COOKE concurs; Chief Judge BREITEL and Judge GABRIELLI concur in another opinion by Judge JONES; Judge WACHTLER dissents and votes to affirm in a separate opinion in which Judge JASEN concurs.
*273 FUCHSBERG, J.
This claim for libel and slander was brought against the State by Dr. Henry I. Stukuls, a former member of the faculty of the State University College at Cortland. The *274 allegedly defamatory matter was uttered and published by Dr. Whitney T. Corey, a vice-president for academic affairs at the college, who, in the absence of Dr. Richard Jones, the college's president, would also act in the latter's stead.[1]
The case comes to us on appeal from the disposition of two motions, that of Dr. Stukuls for pretrial discovery and the State's cross motion under CPLR 3211 (subd [a], par 7) to dismiss the claim for failure to state a cause of action. The cross motion was granted by the Court of Claims because it was of the opinion that the doctrine of absolute privilege was applicable; it then dismissed the discovery motion as moot. The Appellate Division affirmed, but by a divided court, the dissent taking the view that only a qualified privilege was available in this case. For the reasons which follow, we hold that the doctrine of absolute privilege was not a bar to the claim.
The defamation is said to have taken place when, as both parties agree, Dr. Corey, at a meeting with the members of a five-man ad hoc faculty committee which had been chosen to pass on Dr. Stukuls' qualifications for tenure, read the contents of a letter which it is not denied accused Dr. Stukuls, a married man, of having attempted to seduce a young woman who was a student in one of his classes.[2] It is not disputed that the truth of the assertions, made by an unnamed author, had never been verified though the letter had arrived at the college months earlier. Dr. Stukuls has never actually seen the letter, heard it read or been afforded the opportunity to do so. However, the Court of Claims Judge, after making an in camera inspection of it upon the return of the motion for discovery, found "[t]here is no question that, if not true, statements contained in the letter were libelous." Dr. Corey, in his affidavit, does not suggest that the claimant's expressed understanding of the import of the letter is either inaccurate or exaggerated, nor does he add any qualifying matter to indicate that its description is taken out of context.
*275 In his verified claim and supporting affidavit, the claimant adds that Dr. Corey was opposed to the grant of tenure and, because of a malicious and willful design to have it denied, had, among other things, chosen to advantage himself of President Jones' absence from the country to take the letter from the president's private file so that he might use it as a means of affecting the committee's judgment, read the letter to the committee though he knew its accusations had been the subject of a rumor that had been circulated and discredited many months earlier, and, as he has since admitted to Dr. Stukuls and to others, removed favorable student course evaluations and letters from Dr. Stukuls' personnel file before submitting it to the committee. The claimant pleads that, as a consequence of the uttering and publishing of the defamatory matter, he was denied tenure and was greatly injured in his personal and professional reputation.
Against that background, and bearing in mind that on a motion under CPLR 3211 (subd [a], par 7) we are concerned with whether the pleading states a cause of action rather than the ultimate determination of the facts (see Rovello v Orofino Realty Co., 40 N.Y.2d 633), we turn to the central question on this appeal: Is defendant protected by an absolute privilege or a qualified one?
The difference between the two rests in the role of malice. A qualified privilege is one that is available only in the absence of malice, while an absolute privilege, a veritable immunity, is impervious to proof, and therefore to a charge, of malice (Andrews v Gardiner, 224 N.Y. 440, 446).
Absolute privilege is an ancient doctrine. Long recognized by English law as a means to protect freedom of speech and deliberation in Parliament, it was later embodied in American Constitutions, including that of New York State (NY Const, art III, § 11), so that our legislators would enjoy an uninhibited range of freedom to propose, oppose, debate, adopt or reject ideas as precursors to legislative action (see Yankwich, Immunity of Congressional Speech  Its Origin, Meaning and Scope, 99 U of Pa L Rev 960; see, also, Hinds' Precedents of the House of Representatives, § 2670 et seq.; and § 1655). By a parallel development in the judicial sphere it has served to bolster our Judges' freedom to act without fear or favor in the furtherance of a "vigorous and independent administration of justice" (Yates v Lansing, 5 Johns 282, 292 [KENT, Ch. J.], affd 9 Johns 395). Instinct in the immunity from suit for libel and *276 slander granted to the ministers of each of these two branches of government, legislators and Judges both, is recognition that the exercise of the responsibilities of those offices requires the making or pronouncement of judgments, the exercise of discretion, the expression and encouragement of even controverted fact and opinion, and the recognition, evolution or enforcement of public policy.[3]
The right of nonjudicial and nonlegislative governmental officials to assert such an immunity is of relatively recent origin. It had its genesis in England in 1895 (Chatterton v Secretary of State of India [1895], 2 QB 189) and was adopted in this country a year later (Spalding v Vilas, 161 US 483 [postmaster general]). Significantly, both cases involved cabinet officers and were based upon the rationale that such highranking officials, "who speak for the government or as its mouthpiece", formulate and pronounce policy in varying degrees and, therefore, in a broad sense are an embodiment of government itself, should not, while carrying out their official duties,[4] be apprehensive that their motives might become the subject of inquiry in a civil suit (Veeder, Absolute Immunity In Defamation, 10 Col L Rev 131, 141).
In England, the doctrine's application for the most part continued to be applied to top-level officials whose conduct constitutes an "act of state" (Szalatnay-Stacho v Fink [1947], 1 KB 1), but in the United States it has followed a more checkered jurisprudential course. Our Federal courts, which at first adopted the concept of absolute privilege for the executive branch of Government with great hesitancy, gradually extended the zone of its application to encompass an ever-broadening range of officials. That trend culminated in a variegated group of opinions in a five to four decision noteworthy for the divergence of the views of the members of the court on the public policy to be applied (Barr v Matteo, 360 US 564; see Becht, Absolute Privilege of the Executive in Defamation, 15 Vand L Rev 1127, esp pp 1135-1148; cf. Prosser, Torts [4th ed], § 114, p 783).
In the State courts, except for cases against officials of cabinet rank, the decisions have been divided and often inconsistent. *277 This has led to much judicial and other soul-searching, with most of the commentators in the end arriving at the conclusion that absolute priilege for officials of the executive branch of government should be reserved for only those at its highest echelons (Becht, op. cit., pp 1148-1171; see, also, Restatement, Torts 2d, § 591, and Comments thereto; § 598A; Handler & Klein, Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv L Rev 44, 50, n 24; Gray, Private Wrongs of Public Servants, 47 Cal L Rev 303).
New York has been reluctant to extend the applicability of absolute privilege to cases that would represent a departure from the policies which originally brought the doctrine into being. Thus, we have applied it to a borough president, who, as a member of the Board of Estimate, then New York City's senior legislative body, and the elected head of one of the five boroughs which make up that megalopolis, was one of its chief executives (Sheridan v Crisona, 14 N.Y.2d 108) and to members of the New York City Board of Higher Education, which is specifically empowered by statute to "govern and administer" the city's entire system of colleges (Education Law, § 6202; see, also, Education Law, § 6203; Lombardo v Stoke, 18 N.Y.2d 394). Other courts in our State have granted the benefits of absolute privilege to the State Commissioner of Education, "the chief executive officer of the state system of education" (Education Law, § 305, subd 1); Laurence Univ. v State of New York, 41 AD2d 463), to a town supervisor, the chief executive officer of that unit of government (Town Law, § 29; see, also, County Law, § 150; Duffy v Kipers, 26 AD2d 127) and to members of a city board of education entrusted with authority to administer all the schools within the jurisdiction of its school system (Educaion Law, § 2501 et seq.; Smith v Helbraun 21 AD2d 830).
By way of contrast, only a qualified privilege has been extended to the head of a New York State school for deaf mutes (Hemmens v Nelson, 138 N.Y. 517, 523), to employees, as distinguished from board members, of a board of education (Green v Kinsella, 36 AD2d 677), to a State examiner of accounts (Peeples v State of New York, 179 Misc 272, qualifiedly disapproved in Ward Telecommunications & Computer Servs. v State of New York, 42 N.Y.2d 289 [decided herewith]), and to a high school principal (McAulay v Maloff, 82 Misc 2d 447; see, also, Walker v Best, 107 App Div 304; cf. Restatement, *278 Torts 2d, § 598A, supporting only a "conditional privilege" for "inferior" State officials). It is interesting that, in Lombardo v Stoke (supra, pp 398-399), while recognizing an absolute immunity for members of the board of higher education, we would not willy-nilly do so for the president of one of its constituent colleges, but thought it better to save that question for another day.[5] That day is now.
This analysis leads us to conclude that, unless an official is a principal executive of State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension, policy considerations do not require that he be given an absolute license to defame. The privilege exists to protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders. This at least serves a recognized public purpose. But to cloak public officers who do not have such a need with the privilege to wrongfully vilify others with impunity while their critics remain fully liable for their own tortious communications, would tend to squelch criticism of government by its citizens while serving no sufficiently countervailing public purpose. After all, the immunity is intended for the welfare of the public and not for governmental employees (cf. Doe v McMillan, 412 US 306, 319-324; Hyman v Press Pub. Co., 199 App Div 609, 611). A less discriminating resort to absolute immunity would remove a desirable "check upon calumny" (Andrews v Gardiner, 224 N.Y. 440, 448 [CARDOZO, J.]).
Public officials who are not entitled to the immunizing shield of an absolute privilege are not left without the considerable, albeit incomplete, protections from liability for defamation afforded those who communicate orally or in writing in good faith in the course of the performance of their duties of office. Judge (later Chief Judge) DESMOND's survey of the law of qualified privilege, applicable alike to public officials and to others, makes that clear: "`"A communication made bona fide upon any subject matter in which the party communicating *279 has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contained criminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation"' (Byam v. Collins, 111 N.Y. 143, 150). `The rule of law that permits such publications grew out of the desirability in the public interest of encouraging a full and fair statement by persons having a legal or moral duty to communicate their knowledge and information about a person in whom they have an interest to another who also has an interest in such person. Such privilege is known as a qualified privilege. It is qualified because it does not extend beyond such statements as the writer makes in the performance of such duty and in good faith believing them to be true' (Bingham v Gaynor, 203 N.Y. 27, 31). When defendant's statements are presumptively privileged the rule is that, in order to render them actionable, it is `incumbent on the plaintiff to prove that [they were] false and that the defendant was actuated by express malice or actual ill-will. While there are numerous cases in the books in which it is said that as to privileged communications the good faith of the defendant and the existence of actual malice are questions of fact for the jury, the expression must not be misunderstood. Those questions are for the jury only where there is evidence in the case warranting their submission to the jury, and the burden of proof is on the plaintiff' (Ashcroft v. Hammond, 197 N.Y. 488, 495-496; see Hemmens v. Nelson, 138 N.Y. 517, 529). Falsity is not sufficient for an inference of malice. `"It must be * * * consistent only with a desire to injure the plaintiff to justify * * * [sending] the question of malice to the jury"' (Fowles v. Bowen, 30 N.Y. 20, 26; see Loewinthan v. Le Vine, 299 N.Y. 372, 375). `By actual malice is meant "personal spite or ill will, or culpable recklessness or negligence"' (Hoeppner v. Dunkirk Print. Co., 254 N.Y. 95, 106)." (Shapiro v Health Ins. Plan of Greater N. Y., 7 N.Y.2d 56, 60-61.)
Now applying the principles to which we have alluded, we note first that, while Dr. Corey's role in communicating with the tenure committee no doubt was an important one to the parties involved, and not least of all to himself as acting president and vice-president of the college, neither of his two offices falls within the class of executive positions in our State and local government for whom the extraordinary doctrine of *280 absolute privilege is intended. The State University's decision-making process is vested in its trustees and Chancellor. It is they who administer our system of higher education at its policy-making level, which embraces even the ultimate determination of whether tenure is to be granted (see Education Law, §§ 354, 355; 8 NYCRR 335.3; cf. Gadzella v Neumaier, 67 Misc 2d 585). Dr. Corey was not carrying out those functions. His actions under scrutiny here were ones undertaken during the discharge of his own official duties (cf. Ward Telecommunications & Computer Servs. v State of New York, 42 N.Y.2d 289, supra [decided herewith]).
Basically, Dr. Corey's functions are akin to those exercised by the heads of the schools in McAulay v Maloff (82 Misc 2d 447, supra) and Hemmens v Nelson (138 N.Y. 517, supra), to neither of whom the doctrine was found applicable. As Justice MAHONEY observed in the course of his dissent at the Appellate Division in the present case, "it is difficult to perceive how the goal of protecting our highest administrative, judicial and legislative officials from undue harassment is advanced by extending the salutary doctrine of absolute privilege to all presidents of public colleges" (53 AD2d 368, 373). In fact, one would be hard put to rationalize a recognition of absolute immunity for the president of a public college while limiting the presidents of the many outstanding private colleges in our State, with their often broader, more independent and additional responsibilities in fund-raising and policy-making areas, to the significant safeguards of qualified privilege alone (cf. Bounds v Mutual of Omaha Ins. Co., 37 AD2d 1008, 1009).
Indeed, it seems to us that the proliferation of government into more and more activities which in the past had been confined to the private sector militates against any automatic equating of governmental employment with absolute immunity or its ready extension beyond the areas into which it has heretofore been permitted. (See Pecue v West, 233 N.Y. 316, 321; Andrews v Gardiner, 224 N.Y. 440, supra; 1 Seelman, Libel and Slander § 272, p 367.)
However, the claimant's row will not be one easy for him to hoe. The indication is strong that the communication for which Dr. Stukuls faults Dr. Corey and, therefore, the State, as his employer, was one made in the course of Dr. Corey's employment. The subject in connection with which the communication presumably was made was one in which Dr. Corey had an official interest, if not a duty. That also may hold true *281 with respect to his personal recommendation, which here was adverse. The letter reading did not take place before a large or disinterested audience, but at a meeting of the small, and perhaps sophisticated, committee of five people, in each of whom a corresponding interest, or duty, resided. In his affidavit, Dr. Corey further asserts that he made an affirmative attempt to narrowly confine the publication of the contents of the letter by exacting a pledge that the committee members would keep the information to themselves, though Dr. Stukuls argues that the inference to be drawn from the apparently unsuccessful attempt at secrecy is that there was a consciousness of wrongdoing.
Furthermore, if the letter was presented as rumor or suspicion rather than as fact, Dr. Stukuls will be confronted with an additional obstacle.[6] For, as to a defamatory rumor as distinguished from a defamatory fact, mere knowledge or belief that the rumor is false will not necessarily defeat the privilege, provided it was "(a) * * * state[d] * * * as rumor or suspicion and not as fact, and (b) the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable." (Restatement, Torts 2d, § 602.) This gives recognition to the fact that "there are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or reason to believe that it represents the truth" (Prosser, Torts [4th ed], § 115, pp 795-796).
Of course, even then, the protection of the privilege will still be subject to defeasance by excessive publication (Restatement, Torts 2d, § 604), or by the publication of defamatory matter solely for an improper purpose (id., § 605), including its publication "solely from spite or ill will" (id., § 603, Comment a). (See Brewer v Second Baptist Church of Los Angeles, 32 Cal 2d 791, 797 [TRAYNOR, J.]; Prosser, Torts [4th ed], § 115, pp 792-796.) But, in this case, given the undisputed responsibilities of the committee, the relationship which Dr. Stukuls and Dr. Corey each bore to its functioning in this instance and the embarrassment which could ensue if, not having been presented to the committee for whatever it was worth, the rumor, if that it was, were to surface later as fact or rumor, it might be well-nigh impossible for Dr. Stukuls to successfully carry *282 the burden of proving that malice was the one and only cause for the publication. (See Restatement, Torts 2d, § 613, subd [1], par [h].)
On the other hand, on the basis of the allegations in his claim and his affidavit taken as a whole, it cannot be said in advance of discovery that Dr. Stukuls will not be able to raise an issue of fact. That Dr. Corey uttered the defamatory matter before the committee does not necessarily mean that he was doing so to advance its interests. He may have been acting duplicitously while motivated solely by his ill will towards Dr. Stukuls. In fact, at this juncture, we do not know whether Dr. Corey was under a professional obligation to see to it that the letter came to the attention of the committee at all. If, for instance, it was rumor, or known to him or other college authorities to be false or to be no more than a republication of a rumor which previously had been discredited, he may not have had any obligation to communicate; rather, under such circumstances, he may have been under a contrary obligation, that is, not to use such misleading, unreliable or defamatory matter.
It therefore could be found as a fact, after taking into account such things as the college's practice with regard to communications of that sort, the surreptitious manner in which Dr. Corey communicated it to the committee, his contemporaneous extraction of favorable documents from Dr. Stukuls' file and such other facts as may be developed on discovery, that Dr. Corey was embarked on but a spiteful course of his own. In short, whether the defamatory matter was presented as rumor would be important, but not necessarily determinative.
Dr. Stukuls should therefore have been given the opportunity to discover the source and contents of the letter; at whose initiative its reading in fact came about; what relationship it bore, if any, to the past circulation of a rumor; what part the revelation of the letter played in the committee's recommendation and in President Jones' ultimate decision to recommend against tenure to the university; the statements which accompanied the reading of the letter, including those which tended to characterize it as fact or rumor; the extent of Dr. Corey's knowledge of its truth or falsity and his efforts, if any, to acquire that information; the practice, if one there was, with regard to the use of such letters in arriving at tenure decisions at the college; the nature of the other documents *283 removed from claimant's file by Dr. Corey and when and why that was done; whether Dr. Stukuls was confronted with the contents of the letter and afforded an opportunity to respond to it; and such other matters as the Court of Claims in its judgment may deem appropriate.
Accordingly, the order of the Appellate Division should be reversed and the case remitted to the Court of Claims for consideration and disposition of the motion for discovery in accordance with this opinion.
JONES, J.
I agree that the publication by Dr. Corey of the defamatory letter to the faculty evaluation committee is not entitled to the shelter of an absolute privilege. What I perceive as a deficiency in Judge FUCHSBERG'S opinion, however, impels me to write this concurrence. Although that opinion now takes note of the special treatment the law accords publication of defamatory rumor, I still regard its analysis and application of this aspect of the qualified or conditional privilege  a privilege to which all concede this publication was entitled at a minimum  as insufficient in its development and incorrect in its focus.
"[T]here are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or any reason to believe that it represents the truth." (Prosser, Torts [4th ed], § 115, pp 795-796.) Section 602 of the Restatement Second of the Law of Torts is squarely in point:
"Publication of Defamatory Rumor
"One who upon an occasion giving rise to a conditional privilege publishes a defamatory rumor or suspicion concerning another does not abuse the privilege, even if he knows or believes the rumor or suspicion to be false, if
"(a) he states the defamatory matter as rumor or suspicion and not as fact, and
"(b) the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable."
In my analysis this case should be remitted for proof as to whether Dr. Corey brought the defamatory letter to the attention of the evaluation committee for the purpose of advancing the interests of that committee in reaching its determination, and whether in so informing the committee he *284 reported the contents of the letter to it only as rumor and suspicion (rather than fact) which would be relevant to its deliberations. If such be the proof, that will end the matter in judgment for the State. If, on the contrary, the proof shows that the report was not made for the benefit of the committee or that Dr. Corey reported the contents of the letter as fact rather than rumor, it will then be appropriate to proceed to the inquiry contemplated by Judge FUCHSBERG, i.e., whether the publication was made with malice. It is the characterization that Dr. Corey gave his communication to the committee, not whether the letter turns out to have been cast in terms of rumor or suspicion rather than of fact, which will be determinative.
The law with respect to publication of defamatory rumor was anticipated in this State at least as early as 1922 when our court in Pecue v West (233 N.Y. 316, 323) recognized that different consequences would attach to a publication if the author "reports it not as a rumor but as a statement of fact for which he vouches", and pointedly noted there that "[w]e are not dealing with a case where a citizen transmits to a district attorney for his investigation information, suspicions, rumors, gossip, for what they are worth", adding "[m]alice could not be inferred from such an act, nor would it evince bad faith or recklessness." (Cf. Doane v Grew, 220 Mass 171.)
It makes great common sense that there should be no liability in circumstances in which there is a qualified or conditional privilege, if the publisher reports the defamatory matter to advance the legitimate interests of the recipient and he states it only for what it is  rumor or suspicion and not fact. The present case admirably illustrates this principle. The faculty evaluation committee was charged with responsibility to pass on Dr. Stukuls' qualifications for tenure. The legitimate interests of that committee dictated that its members be informed of all available relevant information, certainly including that in the Dr. Stukuls file. It is not disputed that the letter which Dr. Corey brought to the committee's attention came from the president's file on Dr. Stukuls. It appears that Dr. Corey may be said to have been invited, by reasonable implication if not expressly, to furnish the committee with data relevant to its deliberations. In his position this would have been natural if not mandatory. It may even be asserted that, having knowledge of the existence of the defamatory letter in the president's file, Dr. Corey was under a professional *285 obligation to see to it that the letter came to the attention of the committee  not as an accurate and true statement of fact as to what was charged in the letter, but as a rumored report with respect to the truth of which Dr. Corey had no knowledge and made no representations. Other situations can readily be visualized in which the legitimate interests of the recipients and the relation to them of the publisher would make failure to report known rumors an undoubted dereliction of duty. In such instances it would be irrational to predicate liability on an assertion that the publisher knew of the falsity of the publication or that he acted in reckless disregard of its truth or falsity, i.e., the concept traditionally labeled "malice" in the law of defamation (cf. Restatement, Torts 2d, § 600). Indeed, any such inquiry would be irrelevant; the qualified or conditional privilege itself extends in the circumstances to publication of what is stated by the publisher to be rumor or suspicion, even though known by him to be wholly without foundation.
That this rule should be applied to cases like the present may be otherwise demonstrated. Assume the defamed teacher later were to make a sexual assault on a student and in consequence a claim or action were instituted against the educational institution. It takes no imagination to visualize the relish with which the claimant's attorney would view proof that for some reason a letter charging similar prior sexual misbehavior, known to have been in the files, was kept from the committee whose recommendation led to retention of the teacher on the faculty.
On the other hand, if the proof shows that Dr. Corey did not act for the purpose of advancing the legitimate interests of the evaluation committee, but made the report to the committee solely from spite or ill will against Dr. Stukuls, there would be an abuse of the qualified or conditional privilege giving rise to liability. If the report to the committee was made for the purpose of advancing the legitimate interests of the committee, however, the fact that the report was inspired in part by resentment or indignation at Dr. Stukuls' rumored misbehavior would not constitute an abuse of the privilege. (Restatement, Torts 2d, § 603, Comment a; see § 605.)
In sum it is my view that, irrespective of the presence or absence of the traditional element of "malice" or of ill will, the qualified or conditional privilege which attached to Dr. Corey's communications with the faculty committee would not *286 have been abused and the State would not be liable if the letter about Dr. Stukuls was presented to the faculty committee for its benefit and was identified as rumor or suspicion only, with no vouching on his part, directly or indirectly, that its contents were true.
I agree with Judge FUCHSBERG that it was error at the Appellate Division to have affirmed the dismissal of the claim on the ground of absolute privilege. I would, therefore, reinstate the claim and remit the case to the Court of Claims for consideration and disposition of claimant's motion for discovery and for other appropriate proceedings.
WACHTLER, J. (dissenting).
In my view an absolute privilege should attach in the instant case and, therefore, I dissent.
The appellant was seeking continuing appointment ("tenure") as a member of the psychology department of the State University College at Cortland. Pursuant to the procedures established for reviewing an applicant's credentials and qualifications, an ad hoc committee ("committee"), consisting of five members of the faculty at the college, was established. This committee was to investigate the applicant and render an advisory recommendation to the president of the college.
In December, 1974, the committee met to consider appellant's application and called 17 witnesses in connection with the matter. One of these witnesses, Dr. Whitney Corey, was then the vice-president for academic affairs and the acting president of the college. During the course of the meeting, Dr. Corey, in response to inquiries from the committee, read portions of a previously undisclosed letter written about the appellant by an unidentified student. Appellant contends that the letter was defamatory and instituted this action against the State as Dr. Corey's employer. Appellant moved for pretrial discovery and the State cross-moved to dismiss the claim, asserting the defense of absolute privilege. The Court of Claims granted the State's cross motion, and the Appellate Division affirmed, by a divided court.
The issue presented is whether the acting president of a college within the State University system is accorded an absolute privilege with respect to allegedly defamatory statements of another reported by him in the course of his official duties. If that be the case, no liability may be imposed even if the statements were uttered with actual malice (see Sheridan v Crisona, 14 N.Y.2d 108). If, on the other hand, Dr. Corey *287 enjoys only a qualified privilege, an action sounding in defamation would lie if the appellant could establish actual malice (see Hemmens v Nelson, 138 N.Y. 517).
This question was left unanswered by this court's holding in Lombardo v Stoke (18 N.Y.2d 394, 398-399) where we noted that: "Whether or not the president of a municipal college may, under appropriate circumstances, raise the defense of absolute privilege * * * is a question we do not now decide in view of the record before us. In their complaint, the plaintiffs have actually alleged that the defamatory statement was issued `with the knowledge and consent' of the defendant board [of higher education] and published after the board `ratified and approved' the text. Accordingly, we need concern ourselves only with the scope of the board's privilege which, under the circumstances, may be invoked by President Stoke who was allegedly acting at the board's direction and on its behalf." We then held that the board was entitled to absolute privilege in connection with a press release it had issued (Lombardo v Stoke, supra, p 399). Analysis of our decision in that case and of other leading cases leads me to the inescapable conclusion that the protection of absolute privilege is appropriate under the circumstances of this case.
Public policy considerations and the desire to promote the free flow of information necessary to the efficient administration of public affairs led this court to provide an executive official an absolute privilege "to publish false and defamatory matter * * * in the exercise of his executive function if the matter has some relation to the executive proceeding in which the official is acting" (Cheatum v Wehle, 5 N.Y.2d 585, 592, citing 3 Restatement, Torts, § 591). While the Cheatum case dealt with executive officers of the State, courts have recognized that similar considerations of public policy mandated the extension of the shield of absolute immunity to other executive officials as long as the allegedly defamatory remarks were made within the scope of their official duties (see, e.g., Sheridan v Crisona, 14 N.Y.2d 108, supra [a borough president]; Lombardo v Stoke, 18 N.Y.2d 394, supra [the board of higher education]; Laurence Univ. v State of New York, 41 AD2d 463 [Commissioner of Education and his subordinates]; Duffy v Kipers, 26 AD2d 127 [town supervisor]; Smith v Helbraun, 21 AD2d 830 [Board of Education of the City of Peekskill]). These decisions make clear the rule that where the executive official is acting within the scope of his official duties and the matter *288 is one of general importance and public concern, he is cloaked with an absolute privilege. The privilege is extended in order to secure and enhance the public policy of this State to encourage efficient governmental administration.
In the case now before us, the granting or withholding of tenure at State institutions of higher learning is clearly a matter of public interest. The public is best served only if the most qualified applicants receive appointments. In this regard, the committee was established for the purpose of advising the president in matters of tenure, and it cannot be gainsaid it is essential that the committee be fully and candidly apprised of all matters which might in any way relate to the applicant's fitness and qualifications. Concomitantly, the acting president of a college within the State University system, when in possession of information potentially pertinent to the committee's inquiry, is clearly acting within the scope of his official duties and must be free to communicate that information to the committee in an open and unfettered manner.
Further, the burden of investigating the credibility of the information in the possession of the school official should not be placed upon his shoulders. Rather, it is the committee that is charged with making a report and recommendation concerning tenure. Hence, it is the committee which should investigate the information received by it and determine the weight to be accorded that information. To require that the acting president verify all information received by him before he could transmit it to the committee would distort the established procedure for tenure decisions and tend to deprive the committee of the benefit of complete candor and full disclosure of essential information. The protection of the interests of the public at large therefore requires that Dr. Corey be accorded this absolute privilege.
Of course, we need but note that this absolute privilege only attaches where the official is acting in his official capacity and within the context of an official proceeding (Lombardo v Stoke, 18 N.Y.2d 394, 401, supra). Further, the subject of the communication must be relevant to the matter at issue (see James v Powell, 14 N.Y.2d 881). Thus, while Dr. Corey's statements before the committee are protected by absolute privilege, were he to read the same letter to the general public from the steps of the schoolhouse, no such protection would be granted.
Accordingly, the order of the Appellate Division should be affirmed.
Order reversed, without costs, claim reinstated and case remitted to the Court of Claims for further proceedings in accordance with the opinions herein.
NOTES
[1] The claim is brought against the State alone under the doctrine of respondeat superior (cf. Jones v State of New York, 33 N.Y.2d 275; Goodyear Aluminum Prods. v State of New York, 12 AD2d 692).
[2] Dr. Corey says that he "met" with the committee. Although the dissent refers to his role there as that of a "witness", that designation, which appears to be taken from a brief of one of the litigants, has no foundation in the record. Nothing indicates that his appearance was testimonial in nature. In any event, no special significance is to be attributed to either characterizaion in the context of this case.
[3] We are not concerned in this case with auxiliary grants of absolute privilege to others, such as lawyers and witnesses, who occupy other vital places in adjudicatory, and legislative proceedings (see Prosser, Torts [4th ed], § 114, pp 777-779).
[4] Absolute immunity does not apply to a communication outside an official's competence (Cheatum v Wehle, 5 N.Y.2d 585, 593).
[5] Lombardo v Stoke (supra, p 402) reveals that Judge KEATING'S comments in his concurring opinion that absolute privilege "should be sparingly extended" was consonant with the views of a majority of that court. Judges VAN VOORHIS and BURKE expressly joined that opinion; Judge SCILEPPI, by his dissent, evidenced a readiness for even a firmer position against extension.
[6] The word "rumor" has been well defined as signifying "a flying or popular report, the common talk * * * not the remarks of a single person" (Smith v Moore, 74 Vt 81, 86).