JUSTINA KILCOIN, Respondent, v OLEH M. WOLANSKY, Appellant.

Second Department, May 27, 1980

2

## APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (William J. Caplow* and *Robert S. Hammer* of counsel; *Douglas Lasdon* on the brief), for appellant.

*Bernard Kessler (Davison F. Moore* on the brief), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

The primary issue raised on this appeal is whether the defendant's position and job responsibilities afford him an absolute privilege against plaintiff's libel action. Special Term, holding that the defendant enjoyed only a qualified privilege, denied his motion for summary judgment dismissing the complaint.

In January, 1975 plaintiff, Justina Kilcoin, was hired as Chief of Services of the Middletown Retardation Unit of Letchworth Village Developmental Center. Defendant, Oleh M. Wolansky, was the director of that center. Sometime in 1976, reports began to surface concerning incidents of alleged mishandling and abuse of patients at the facility, and an investigation was initiated. One apparent outgrowth of the inquiry was the filing of a notice and statement of charges against Ms. Kilcoin. The notice, dated October 12, 1977, contained 5 separate charges and 10 specifications of misconduct. Essentially, it was alleged that Ms. Kilcoin submitted six incident reports which were either incomplete or untimely, failed to respond appropriately to inquiries of the center's special review committee regarding one of the incidents, failed to supervise employees properly, failed to report a serious incident of patient abuse allegedly committed by an employee who was under her supervision, and failed to suspend an employee suspected in another instance of patient abuse. Based upon these charges, Ms. Kilcoin subsequently received an official reprimand which stated:

"You are cautioned that your duties as Chief of Services of the Letchworth Village Unit at Middletown Psychiatric Center require that you conform to the policies set forth by Letchworth Village Developmental Center and the Special Review Committee in reporting and investigating all incidents that occur in your Unit. You are advised to become familiar with the resident abuse procedure and the procedures estab-

lished by the Special Review Committee and conform to those procedures in the most stringent manner.

"Your lack of initiative and follow through in the completion of incident reports will not be tolerated. Any further incidents in which you are found to be negligent in completing your reports on time or submitting reports that are not fully investigated will be cause for additional penalties.

"You are further advised that you are to place greater emphasis on supervision of your subordinate staff especially your Social Workers who have not been required to complete resident progress notes on a timely basis."

The reprimand, dated November 1, 1977, was signed by Dr. Wolansky.

Thereafter, in December, 1977, two local newspapers published articles concerning continuing difficulties at Letchworth Village. On December 1, the *Times Herald Record,* a Middletown paper, reported that Ms. Kilcoin had been removed temporarily from her position as Chief of Services "during an investigation concerning employee behavior." The article quoted Ms. Kilcoin's reaction to the charges as well as comments by Letchworth's Deputy Director of Administration and other "sources at the facility." Dr. Wolansky was not mentioned either as a source of information or as a principal in the controversy.

On December 6, 1977, Rockland County's *Journal-News* reported that "[c]harges of possible patient abuse will be brought against top administrators of the Middletown Unit of Letchworth Village". Attributing its information to an official of the Civil Service Employees Association, the paper identified Ms. Kilcoin "as being under investigation." The article further identified Dr. Wolansky as the official who had "launched" the investigation and had ordered the questioning of more than 200 workers at the facility concerning patient conditions there. Dr. Wolansky reportedly confirmed to the paper that an investigation was underway affecting "high echelon" positions at Letchworth, but he would make no further comment with respect to the individuals involved.

On December 20, 1977 the *Journal-News* reported that two Letchworth employees had been charged "with abusing patients at the facility." Dr. Wolansky was quoted as saying that those charged faced disciplinary hearings for what he described as "some failure to implement regulations by the

Department of Mental Hygiene." According to the article, after stating that both employees had denied the charges, Dr. Wolansky spoke of the "few patients" involved and explained: "There are several incidents where we feel they were abused * * * Abuse is a very broad aspect. The lack of performing duties could be considered abuse. The question of abuse could not only be a case of serious injury to the body, but could also be verbal abuse, depriving a person of certain essential services." Dr. Wolansky declined to name the employees involved but promised to release complete details of the charges after decisions were reached by the hearing officers. He did disclose that one of the employees was a "team leader" at the facility and the other was its Chief of Services. The newspaper, revealing that it had learned the identities of the charged employees, published their names. One so named was Justina Kilcoin. Evidently the article was accurate for it appears that additional charges were filed against Ms. Kilcoin in December, 1977. Those charges, however, are not directly involved in this appeal.

On March 16, 1978 Ms. Kilcoin instituted a libel action against Dr. Wolansky. Her complaint alleged that she had been maliciously defamed by false accusations published in the October 12 notice and statement of charges, in the subsequent reprimand, and in the newspaper articles. In addition, her complaint asserted that she had been defamed by a notice, appearing on the facility's bulletin board, advertising the availability of her position of Chief of Services. This advertisement, she claimed, had left fellow employees with a "libelous impression."

In an attempt to demonstrate malice, the complaint alleged that Dr. Wolansky had acted beyond the scope of his employment by unlawfully issuing the reprimand without having first afforded Ms. Kilcoin the hearing required by section 75 of the Civil Service Law. The complaint noted that on February 17, 1978, both the reprimand and the advertisement for a Chief of Services had been rescinded.

In his answer, Dr. Wolansky admitted that no disciplinary hearing had been held on the original charges, but he averred that Ms. Kilcoin had affirmatively waived her right to a hearing, agreeing instead to improve her performance and to accept the sanction of an official reprimand. Dr. Wolansky acknowledged that the reprimand had subsequently been withdrawn, but he asserted that the underlying charges had

merely been deferred and were scheduled to be considered later together with the additional charges filed against Ms. Kilcoin in December. In fact, a letter to that effect had been sent to Ms. Kilcoin's attorneys. Dr. Wolansky's answer also asserted several affirmative defenses including qualified and absolute privilege.

Subsequently, Dr. Wolansky moved for summary judgment dismissing the complaint, *inter alia,* on the ground that he was immune from suit and was protected by an absolute privilege. Ms. Kilcoin's responding papers asserted that Dr. Wolansky did not have immunity because he had acted unlawfully and outside the scope of his responsibilities. Once again, as evidence of malice, she pointed to his failure to afford her a statutory hearing on the charges. She did not address the allegation that she had waived that hearing.

Special Term denied the motion for summary judgment, finding that Dr. Wolansky enjoyed a qualified but not an absolute privilege. It is from this denial that Dr. Wolansky now appeals.

There exists, of course, a marked and well-settled distinction between absolute and qualified privilege in actions for defamation. A qualified privilege arises whenever a person makes a bona fide communication upon a subject in which he has an interest or in connection with which he has a legal, moral or social duty to speak, and the communication is made to a person having a corresponding interest or duty. (See *Shapiro v Health Ins. Plan of Greater N. Y.,* 7 NY2d 56, 60; *Byam v Collins,* 111 NY 143, 150.) The policy of the law is to encourage such communications, and therefore the speaker is afforded protection against actions in defamation unless it can be established that he spoke out of express malice or actual ill will. A qualified privilege, then, may be destroyed by proof of malice. *(Andrews v Gardiner,* 224 NY 440, 446.)

In contrast, as the name suggests, an absolute privilege affords complete immunity from defamation suits regardless of any malice which may have actuated the speaker. (See *Stukuls v State of New York,* 42 NY2d 272, 275.) This substantially greater protection has been applied sparingly since it is rarely in the public interest to leave without remedy those who have been maliciously defamed. (See *Schermerhorn v Rosenberg,* 73 AD2d 276.) Hence, at least with respect to the executive branch, New York has been reluctant to extend the applicability of absolute privilege beyond that necessary "to

protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders." *(Stukuls v State of New York, supra,* p 278.) In *Stukuls,* the Court of Appeals (p 280) rejected "any automatic equating of governmental employment with absolute immunity" and declined to accord an absolute privilege to the acting president of a public college. The court wrote (p 278) that, "unless an official is a principal executive of State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension, policy considerations do not require that he be given an absolute license to defame."

■ A somewhat different aspect of the question was presented in *Ward Telecommunications & Computer Servs. v State of New York* (42 NY2d 289), a case decided with *Stukuls.* There, the State Comptroller's office received a request to conduct an audit of a community college pursuant to section 1 of article V of the State Constitution and section 8 of the State Finance Law. The audit report, which was released to the press, stated in part that the cost of services actually provided by the claimant, a local computer service company, was excessive, and it was recommended that the claimant's contract be terminated. In its subsequent defamation action against the State, the claimant argued that only a qualified rather than an absolute privilege should attach to the report because it had been prepared, not by the Comptroller himself, but by employees of the Division of Audit and Accounts. The Court of Appeals, in rejecting that position, reasoned (p 292) that "the absolute privilege of the executive head of department extends to those of subordinate rank who exercise delegated powers". Noting that section 43 of the Executive Law provided authority for the Comptroller to assign the work of an audit to any examiner appointed by him pursuant to law, the court held (p 292) that "the Comptroller and his subordinates by delegation had an absolute privilege with respect to the alleged libelous matter which appeared in the official audit report." (See, also, *Laurence Univ. v State of New York,* 41 AD2d 463.) In our view, a similar result is required in the case at bar.

■ ■ At the outset, it is beyond question that the Commissioner of Mental Retardation and Developmental Disabilities

is entrusted with important policy-making responsibilities of considerable dimension (see, generally, Mental Hygiene Law, art 13) and is therefore protected by an absolute privilege. (Cf. *Cheatum v Wehle*, 5 NY2d 585 [Conservation Commissioner].) Among the responsibilities of the office he heads is to see "that mentally retarded and developmentally disabled persons * * * are provided with care and treatment, that such care and treatment is of high quality and effectiveness, and that the personal and civil rights of persons receiving care and treatment are adequately protected." (Mental Hygiene Law, § 13.07, subd [c].) Although, as in *Ward Telecommunications (supra)*, the commissioner has the statutory power to delegate functions toward the achievement of those objectives (Mental Hygiene Law, § 13.19, subd [a]), Dr. Wolansky did not need to predicate his claim to immunity upon the commissioner's exercise of his delegation authority. Instead, the Mental Hygiene Law itself specifically provides for and contemplates the type of action taken by Dr. Wolansky in furtherance of the goals of the commissioner and the responsibilities of the department. Subdivision (b) of section 13.17 of the Mental Hygiene Law provides for the establishment of Letchworth Village Developmental Center as a "[school] * * * for the care and treatment of the mentally retarded and developmentally disabled and for research and teaching in the science and skills required for the care and treatment of such mentally retarded and developmentally disabled". Section 13.21 then provides in pertinent part:

"(a) The director of a school * * * shall be appointed by the commissioner and shall be its chief executive officer * * * He shall manage the facility, and administer its personnel system, subject to applicable law, the regulations of the commissioner, and the rules of the state civil service commission. *Before the commissioner shall issue any such regulation or any amendment or revision thereof, he shall consult with the directors of schools * * * regarding its suitability.* The director shall maintain effective supervision of all parts of the facility and over all persons employed therein or coming thereon and shall generally direct the care and treatment of patients * * *

"(b) *Such director shall have the responsibility of seeing that there is humane treatment of the patients at his facility and shall investigate every case of alleged patient abuse or mistreatment.*" (Emphasis supplied.)

■ Dr. Wolansky, therefore, had a *specific statutory mandate* to safeguard the rights of patients at the Letchworth facility by assuring humane treatment and by investigating every allegation of abuse or mistreatment. And, significantly, the statute made him a mandatory participant in consultations required prior to the commissioner's promulgation, amendment or revision of any regulation of the office. Clearly, he performed both administrative and high-level policy-making functions. His governmental responsibilities were far more substantial than those of a high school principal who submits an evaluation pursuant to the by-laws of the board of education *(McAulay v Maloff,* 82 Misc 2d 447), or the principal of a school for deaf mutes who reports teacher misconduct pursuant to the by-laws, rules, and regulations adopted by the school's board of trustees *(Hemmens v Nelson,* 138 NY 517), or the acting president of a public college who reports to an *ad hoc* faculty committee on a professor's application for tenure *(Stukuls v State of New York,* 42 NY2d 272, *supra).* We are persuaded that Dr. Wolansky's dual functions, arising as they do out of a specific statutory grant of authority and dealing in an area of profound public importance (see, e.g., *Matter of Brown v Ristich,* 36 NY2d 183, 192, n; cf. *Matter of Eichner [Fox—Dillon],* 73 AD2d 431), are of sufficient dimension to trigger an absolute privilege with regard to the performance of his responsibilities. (Cf. *Smith v Helbraun,* 21 AD2d 830.)

Having so concluded, we are obliged to proceed further and examine whether the privilege should attach under the facts at bar. It is settled that, notwithstanding the position of the speaker, protection will be afforded only where the nature of the remarks and the setting in which they were made are consistent with the policy objectives of the privilege. (See *Clark v McGee,* 49 NY2d 613; *Cheatum v Wehle,* 5 NY2d 585, *supra.)* As the Court of Appeals has recently said *(Clark v McGee, supra,* pp 619, 620):

"Both the subject of the statement and the circumstances in which it is made are of importance in determining whether a particular statement was privileged. * * *

"[T]he guiding principle in determining the availability of this privilege must be the relationship between the speaker's fulfillment of his public duties and the circumstances of his speech."

Thus, in *Clark v McGee (supra),* it was held that an absolute privilege would not attach to a town supervisor's statement to

a local radio reporter concerning a town employee. Nor would the privilege protect a State Conservation Commissioner's remarks made in the course of an after-dinner speech concerning the ability and integrity of a member of his staff. *(Cheatum v Wehle, supra.)*

In the case at bar, the notice and statement of charges and the official reprimand were entirely appropriate and proper means for the communication of the allegations in question. (See Civil Service Law, § 75.) And, in our view, the newspaper articles complained of did not deprive Dr. Wolansky of the absolute privilege to which he would otherwise be entitled. Allegations concerning mistreatment of retarded patients are a matter of significant public concern and, not unexpectedly, the charges here generated fairly widespread newspaper coverage. Dr. Wolansky, as director of the facility, had a duty to assure the public that steps were being taken to safeguard the health and well-being of the patients. He was also entitled to attempt to protect the facility against unwarranted attacks on its operation. (Cf. *Clark v McGee, supra,* p 621). It is significant that his reported statements to the press were not of a vituperative nature. He couched his remarks in terms of allegations rather than of established fact, and took care to note that those accused had denied the charges against them. He explained the nature of the charges in a way that tended to defuse the ordinary reaction to the term "abuse", and he declined to divulge the names of the individuals under investigation. In our view, the methods of communication he chose cannot be said to have been either inappropriate or unwarranted. (See *Lombardo v Stoke,* 18 NY2d 394, 401; cf. *Barr v Matteo,* 360 US 564.) Clearly, the substance of all statements now complained of was strictly confined to the area of Dr. Wolansky's statutory obligation to see "that there is humane treatment of the patients at his facility and [to] investigate every case of alleged patient abuse or mistreatment." (Mental Hygiene Law, § 13.21, subd [b].)

■■ We hold, therefore, that by reason of his position and responsibilities, and the means of communication he employed, Dr. Wolansky was absolutely privileged against the defamation action at bar, and, accordingly, the complaint should have been dismissed. Moreover, even if we were to hold otherwise on the question of absolute privilege, we would nevertheless conclude that the complaint cannot stand.

Ms. Kilcoin does not seriously dispute, and Special Term

expressly held, that Dr. Wolansky was entitled at the least to a qualified privilege. In her complaint and in her response to the motion for summary judgment, Ms. Kilcoin attempted to overcome that privilege by pointing out what she sees as the malice underlying the statements in question. In this regard, the Court of Appeals has cautioned that: "When defendant's statements are presumptively privileged the rule is that, in order to render them actionable, it is 'incumbent on the plaintiff to prove that [they were] false and that the defendant was actuated by express malice or actual ill-will. While there are numerous cases in the books in which it is said that as to privileged communications the good faith of the defendant and the existence of actual malice are questions of fact for the jury, the expression must not be misunderstood. Those questions are for the jury only where there is evidence in the case warranting their submission to the jury, and the burden of proof is on the plaintiff' (*Ashcroft v. Hammond,* 197 N. Y. 488, 495-496; see *Hemmens v. Nelson,* 138 N. Y. 517, 529). Falsity is not sufficient for an inference of malice. ' "It must be * * * consistent only with a desire to injure the plaintiff to justify * * * [sending] the question of malice to the jury" ' *(Fowles v. Bowen,* 30 N. Y. 20, 26; see *Loewinthan v. Le Vine,* 299 N. Y. 372, 375)." *(Shapiro v Health Ins. Plan of Greater N. Y.,* 7 NY2d 56, 61, *supra.)*

██ This rule assumes an added importance where the defendant is an administrator in a governmental agency and the statements complained of concern the performance of an employee under his charge. It is one thing to say that such an administrator, not being a high-level public official, does not enjoy what amounts to "an absolute license to defame." *(Stukuls v State of New York,* 42 NY2d 272, 278, *supra.)* It is quite another thing to suggest that he may be compelled to defend himself in a trial for libel or slander whenever his criticism offends a subordinate who sees it as a malicious attempt to damage his reputation. The reluctance of administrators to act vigorously in promoting efficiency and improved worker performance has long been the bane of government institutions. The constant threat of baseless lawsuits instituted or threatened in order to cow the administrator into foregoing appropriate disciplinary action is contrary to the best operation of government agencies and ultimately does a disservice to the public at large. (Cf. *Gregoire v Biddle,* 177 F2d 579, 581 [HAND, Ch. J.].) We agree, of course, that an employee who

has in fact been maliciously defamed is entitled to redress. However, where, as here, the defendant is an executive of a public institution and is sued on the basis of presumptively privileged statements relating to employee performance, it is incumbent upon the plaintiff at the outset to persuade the court that there is evidence in the case which would warrant a jury finding that the statements in question were actuated solely by personal spite or ill-will, or by culpable recklessness or negligence. *(Hemmens v Nelson,* 138 NY 517, *supra;* cf. *Pecue v West,* 233 NY 316; *Shapiro v Health Ins. Plan of Greater N. Y., supra,* p 61.) Manifestly, Ms. Kilcoin has failed to carry that burden in the case at bar.

In bald conclusory fashion, she simply asserts that the statements complained of were uttered with malice. The only fact she alleges in support of her contention is that she was never afforded a hearing on the original charges as required by law. However, she has never denied Dr. Wolansky's sworn allegation that she affirmatively waived a hearing and agreed to accept the sanction of a reprimand. Such a waiver would be both lawful and effective. (See *Antinore v State of New York,* 40 NY2d 921, affg 49 AD2d 6; *Matter of Auburn Police Local 195 v Helsby,* 62 AD2d 12, affd 46 NY2d 1034.) There is nothing in the record to suggest that, for reasons of ill-will or personal spite, Dr. Wolansky purposefully deprived Ms. Kilcoin of a statutory hearing. She alleges virtually nothing other than that "deprivation" to demonstrate malice. The "surmise, conjecture and suspicion" presented in her papers cannot suffice to defeat a motion for summary judgment. *(Shapiro v Health Ins. Plan of Greater N. Y., supra,* p 63.) Accordingly, even if Dr. Wolansky did not have an absolute privilege, his motion for summary judgment should nonetheless have been granted. (See *Sheridan v Crisona,* 14 NY2d 108; *Crosman v Long Is. Univ.,* 70 AD2d 650; *Brennan v Granite Equip. Leasing Corp.,* 60 AD2d 877.)*

---

* We note that Ms. Kilcoin's papers not only fail to set forth facts to demonstrate malice but they appear to betray an intention to harass. Faced with the motion for summary judgment, she cross-moved for an order disqualifying the Attorney-General from representing Dr. Wolansky. She reiterated that she had not named the State as a defendant because she believed that Dr. Wolansky had acted outside the scope of his authority and was solely responsible for her injury. Nevertheless, pointing to the possibility that Dr. Wolansky might eventually turn to the State for contribution, Ms. Kilcoin argued that the Attorney-General might find himself in a conflict of interest. She therefore asked the court to compel Dr. Wolansky to "retain an attorney of his personal choice."

That Ms. Kilcoin should make such a motion, relating as it does to no discernible

■■ In sum, we hold that the defendant was protected by an absolute privilege, and that, in any event, the plaintiff has failed to carry her burden of laying bare sufficient evidence to demonstrate a triable issue of fact on the question of malice. The order should therefore be reversed insofar as appealed from and the complaint dismissed.

LAZER, GIBBONS and COHALAN, JJ., concur.

Order of the Supreme Court, Orange County, entered January 8, 1979, reversed insofar as appealed from, on the law, with $50 costs and disbursements, the first decretal paragraph thereof is deleted, and defendant's motion for summary judgment dismissing the complaint is granted.

---

interest of hers, suggests something more than a concern over the Attorney-General's ethical position. Rather, it bespeaks Ms. Kilcoin's continuing effort to harass and punish the defendant for what she perceives as the unwarranted disciplinary charges filed against her. This is precisely the sort of conduct which the privilege was meant to forestall.